## LICHTER ET AL., DOING BUSINESS AS SOUTHERN FIREPROOFING CO., v. UNITED STATES.

NO. 105.

Argued November 20–21, 1947.—Decided June 14, 1948.

*Paul W. Steer* argued the cause and filed a brief for petitioners in No. 105.

*Leo R. Friedman* argued the cause for petitioners in No. 74. With him on the brief was *Jos. I. McMullen.*

*Edward C. Park* argued the cause and filed a brief for petitioner in No. 95.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Herbert A. Bergson, Newell A. Clapp, Paul A. Sweeney, Oscar H. Davis* and *Ellis Lyons.*

*O. R. McGuire* and *Julius C. Smith* filed a brief for the Spindale Mills, Inc., as *amicus curiae,* in Nos. 74 and 95, urging reversal.

MR. JUSTICE BURTON delivered the opinion of the Court.

The Renegotiation Act,[1] in time of crisis, presented to this nation a new legislative solution of a major phase

---

[1] The Renegotiation Act, including its amendments, is here treated as consisting of:

I. Section 403, Sixth Supplemental National Defense Appropriation Act, 1942, approved April 28, 1942, c. 247, 56 Stat. 226, 245–246. Sometimes this is called the Original or First Renegotiation Act. For relevant excerpts from its text see Appendix I, *infra,* p. 793.

II. Title VIII, Renegotiation of War Contracts, Revenue Act of 1942, approved October 21, 1942, c. 619, 56 Stat. 798, 982–985, 26 U. S. C. A. *Internal Revenue Acts Beginning 1940,* Revenue Act of 1942, § 801, p. 376. For relevant excerpts from its text see Appendix II, *infra,* p. 795.

III. Section 1, Military Appropriation Act, 1944, approved July 1, 1943, c. 185, 57 Stat. 347–348.

IV. An Act to prevent the payment of excessive fees or compensation in connection with the negotiation of war contracts, approved July 14, 1943, c. 239, 57 Stat. 564–565.

V. Title VII, Renegotiation of War Contracts, and Title VIII, Repricing of War Contracts, Revenue Act of 1943, passed notwithstanding the objections of the President, February 25, 1944, c. 63, 58 Stat. 21, 78–93, 50 U. S. C. (Supp. V, 1946) §§ 1191, 1192; also 26 U. S. C. A. *Internal Revenue Acts Beginning 1940,* Revenue Act of 1943, §§ 701 and 801, pp. 491 and 508. For relevant excerpts from its text see Appendix III, *infra,* p. 798. Sometimes this is called the Second Renegotiation Act. Section 701 (b), of the foregoing Chapter 63, added to § 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, a final subsection as follows: "(l) This section may be cited as the 'Renegotiation Act'." 58 Stat. 90. Section 701 (d) also provided that this subsection (l) of § 403, and certain others, "shall be effective as if such amendments and subsections had been a part of section 403 of such Act on the date of its enactment." 58 Stat. 92.

VI. An Act to extend through December 31, 1945, the termination date under the Renegotiation Act, approved June 30, 1945, c. 210, 59 Stat. 294–295, 50 U. S. C. (Supp. V, 1946) § 1191.

of the problem of national defense against world-wide aggression. Through its contribution to our production program it sought to enable us to take the leading part in winning World War II on an unprecedented scale of total global warfare without abandoning our traditional faith in and reliance upon private enterprise and individual initiative devoted to the public welfare.

In each of the three cases before us the principal issue is the constitutionality, on its face, of the Renegotiation Act insofar as it is authority for the recovery of the excessive profits sought to be recovered by the United States from the respective petitioners. In each case the secondary issue is whether the failure of the respective petitioners to petition the Tax Court for a redetermination of the amount, if any, of their excessive profits excludes from consideration here the coverage of the Act, the amount of the profits and other comparable issues which could have been presented to the Tax Court. In each of these cases the District Court has held that the Act was constitutional and that, by failure to petition the Tax Court for their redetermination, the existing orders have become final as claimed by the Government. Each Circuit Court of Appeals has affirmed, unanimously, the judgment appealed to it. We agree with the courts below.

In each of these cases the United States obtained a judgment for a sum alleged to be owed to it pursuant to a determination of excessive profits under the Renegotiation Act. The determinations of excessive profits in the respective cases were made by the Under Secretary of War or by the War Contracts Price Adjustment Board after the Revenue Act of 1943 had been approved, February 25, 1944. That Act contained, in its Title VII, the so-called Second Renegotiation Act which included provisions for the filing with the Tax Court of petitions for the redeterminations of excess profits. None of these petitioners, however, filed such a petition with the Tax

Court. On the other hand, the respective petitioners have relied upon their claims that, as a matter of law, the Renegotiation Act is unconstitutional on its face insofar as it purports to authorize the judgments which have been taken against the respective petitioners. The petitioners contend also that their failures to file petitions with the Tax Court have not foreclosed their respective rights to contest here the coverage of the Act, the amount of the excess profits found against them and other comparable issues which they might have presented to the Tax Court.

NO. 105 (THE LICHTER CASE).

In May, 1945, the United States filed its complaint in the District Court of the United States for the Southern District of Ohio against the petitioners, Jacob Lichter and Jennie L. Lichter, engaged in the construction business in Cincinnati, Ohio, under the name of the Southern Fireproofing Company, a copartnership. The complaint was founded upon the determination by the Under Secretary of War, dated October 20, 1944, that $70,000 of the profits realized by petitioners during the calendar year 1942 from nine subcontracts, executed in 1942 for a total price of $710,224.16, were, under the Renegotiation Act, excessive profits. The complaint showed that the petitioners were entitled to a tax credit of $42,980.61 against such excessive profits. It alleged, moreover, that the petitioners had not, within the required period, petitioned the Tax Court for a redetermination of the order in question and had not paid or otherwise eliminated the amount of $27,019.39 thus due to the United States.

The petitioners admitted that the Under Secretary had made the determination as alleged; that if his order were valid the petitioners were entitled to the tax credit specified; and that they had not paid the sum demanded nor had they filed a petition with the Tax Court for a rede-

termination of the excessive profits, if any. They put in issue, on specifically stated grounds, the constitutionality of the Renegotiation Act insofar as it might be authority for the recovery of the profits sought to be recovered, and they put in issue the applicability to them of any requirement that they seek in the Tax Court a redetermination of the profits which they had been ordered to repay to the United States. They alleged also that: of the nine subcontracts which were made the basis of renegotiation, all were executed during the calendar year 1942; four were executed before April 28, 1942, the date of the original Renegotiation Act; none contained clauses permitting or requiring their renegotiation; only two of them were for amounts in excess of $100,000 each; these two were among those which had been executed before April 28, 1942; and no excessive profits had been in fact earned by the petitioners during 1942. Finally they alleged that the several contracts referred to were subcontracts entered into under prime contracts which had been awarded by a department of the Government as the result of competitive bidding for the construction of buildings and facilities and the subcontracts themselves had been obtained by petitioners after further competitive bidding. For these and other reasons stated in the answer the contracts were claimed to be exempt from renegotiation.

The United States moved for judgment on the pleadings and, in the alternative, for summary judgment. Affidavits were filed in support of those motions. These included particularly the comprehensive affidavits of Robert P. Patterson, then Under Secretary of War, and of H. Struve Hensel, then Assistant Secretary of the Navy. These affidavits set forth the general background of the Renegotiation Act and the basis for claiming that the renegotiation of war contracts was necessary in order to sustain this nation's share of the burden of winning World War II. Counterparts of these two affidavits were

filed in each of the other cases before us. The petitioners, on the other hand, moved to dismiss the complaint on the grounds that it failed to state a claim upon which relief could be granted and that the profits in question were exempt from the Act.

The District Court made findings of fact substantially as stated in the complaint and admitted in the answer. It concluded that there was no genuine issue as to any material fact and that the United States was entitled to judgment as a matter of law for $27,019.39, with interest at six percent per annum from November 6, 1944. 68 F. Supp. 19. The Circuit Court of Appeals for the Sixth Circuit affirmed the judgment. It held expressly that the Renegotiation Act was valid on its face and that the petitioners, by reason of their failure to petition the Tax Court for a redetermination of the amount of the excessive profits, if any, were barred from making their other attacks on the Secretary's determination of such excessive profits. 160 F. 2d 329. Because of the basic significance of the constitutional questions involved we granted certiorari. 331 U. S. 802.

### NO. 74 (THE POWNALL CASE).

In September, 1945, the United States filed its complaint in the District Court of the United States for the Southern District of California against the petitioners, A. V. Pownall, Grace M. Pownall, and Henes-Morgan Machinery Company, Limited, a California corporation, all three doing business in Los Angeles, California, as co-partners under the name of General Products Company. The record indicates that they were there engaged in the production of precision parts, machinery and tools for use by war contractors. The complaint was founded upon a determination made by the Under Secretary of War, on behalf of the War Contracts Price Adjustment Board, dated December 27, 1944, to the effect that $628,373.14 of

the profits realized by petitioners during the calendar year 1943 on their contracts and subcontracts, subject to renegotiation pursuant to the Renegotiation Act, were excessive profits. The complaint showed that the petitioners were entitled to a tax credit of $514,663.95 against such profits. It alleged, moreover, that the petitioners had not, within the required period, petitioned the Tax Court for a redetermination of the order in question and had not paid the sum of $113,709.19 thus claimed by the United States. The petitioners admitted that the Under Secretary had made the determination as alleged; that the Board had adopted his order; that the appropriate tax credit was as alleged; that no petition for redetermination had been filed with the Tax Court; that the time for filing had expired; and that no payment of the amount claimed had been made. The petitioners alleged, however, that the Renegotiation Act was invalid on its face on numerous specifically stated constitutional grounds; that the Under Secretary's order was invalid in that it was based on undisclosed data and contained no findings; and that no single contract under consideration exceeded in amount the sum of $99,000.

The United States moved for judgment on the pleadings and, in the alternative, for summary judgment. The petitioners did the same. Under the stipulations of the parties there were no disputed issues of fact and the only questions left for decision were those as to the constitutional validity of the Act and as to its interpretation if found to be valid.

The District Court denied the motions of both parties. However, ruling on the merits of the cause thus before it, it found the facts to be substantially as alleged in the complaint and as stipulated. It held the Act to be valid on its face and held the unappealed determination of excessive profits to be final. It rendered judgment for the United States for $121,043.39, evidently repre-

senting $113,709.19, with interest at six percent per annum from March 13, 1945. 65 F. Supp. 147, and see findings of fact, conclusions of law and judgment of the court. The Circuit Court of Appeals for the Ninth Circuit affirmed the judgment. It followed its earlier decision in *Spaulding* v. *Douglas Aircraft Co.*, 154 F. 2d 419, in upholding the constitutionality of the Act and expressly holding that the petitioners, by not having petitioned the Tax Court for relief, had failed to exhaust their administrative remedies. Accordingly, it held that the District Court was without jurisdiction to consider the petitioners' contentions as to the coverage of the Act. 159 F. 2d 73. We granted certiorari. 331 U. S. 802.

NO. 95 (THE ALEXANDER CASE).

In August, 1945, the United States filed its complaint in the District Court of the United States for the District of Massachusetts against the petitioner, Alexander Wool Combing Company, a Massachusetts corporation doing business at Lowell, Massachusetts, and there engaged in the business of scouring wool and combing it into tops and noils for commissions paid to it by the owners of the wool. The complaint was founded upon two determinations by the Under Secretary of War, both dated September 6, 1944. One determined that $22,500 of the profits realized by the petitioner during its fiscal year ended June 30, 1942, and the other that $45,000 of the profits realized by the petitioner during its fiscal year ended June 30, 1943, under its contracts and subcontracts which were alleged to be subject to the provisions of the Renegotiation Act, were excessive. The complaint showed that the petitioner was entitled to a tax credit of $15,020.80 against such excessive profits for the fiscal year ended June 30, 1942, and of $36,596.42 against those for the fiscal year ended June 30, 1943. The complaint alleged, moreover, that the petitioner had not, within the

required periods, petitioned the Tax Court for a redetermination of either of the orders in question; that the respective periods for filing such petitions had expired; and that the petitioner had not paid, or otherwise eliminated, the amount of $15,882.78 thus due to the United States. The petitioner admitted the factual allegations of the complaint but denied that any amount was owing to the United States. It claimed that the determinations made by the Under Secretary were void because made without due process of law and were unenforcible as to the petitioner because, as applied to it, they were unconstitutional for several specifically stated reasons.

The United States moved for judgment on the pleadings or, in the alternative, for summary judgment. In support of these motions the above-mentioned affidavits of Robert P. Patterson, Under Secretary of War, and of H. Struve Hensel, Assistant Secretary of the Navy, and several others were filed. Evidence both oral and in affidavit form was submitted in opposition. The District Court stated in its opinion, 66 F. Supp. 389, 391, that the petitioner "had no direct contracts with any department or agency of the United States. It combed wool for different private companies. It knew that some of the wool it combed for the companies was destined for use in government contracts, but it was and is ignorant as to the destination of other wool." That court, nevertheless, rendered judgment in favor of the United States, for $15,882.78, with interest at six percent per annum from September 6, 1944. It held that the war powers of Congress were sufficient to enable it to authorize the recapture of excessive profits such as these; that the standard of "excessive profits" was sufficient to satisfy the constitutional limitations on the power of Congress to delegate authority; that any defects in the departmental proceedings were immaterial in view of the opportunity afforded the petitioner for a trial *de novo* and

for a redetermination of excessive profits, if any, in the Tax Court; and that petitioner's defenses on the ground of lack of coverage or of retroactivity of the application of the Renegotiation Act to the petitioner were lost to it by its failure to seek relief from the Tax Court. The Circuit Court of Appeals for the First Circuit said, *per curiam:* "We think the court below adequately covered all the issues in this case and we affirm its judgment upon the grounds and for the reasons set forth in its opinion . . . ." 160 F. 2d 103.[2] We granted certiorari. 331 U. S. 802.

### THE BACKGROUND.

We have two main issues before us: (1) the constitutionality of the Renegotiation Act on its face and (2) the finality of the determination of the excessive profits made under it in the absence of a petition filed with the Tax Court within the required time, seeking a redetermination of those profits. In the *Lichter* case we have issues as to profits made in the calendar year 1942, in the *Pownall* case as to profits made in the calendar year 1943, and in the *Alexander* case as to certain profits made in the fiscal year ended June 30, 1942, and as to other profits made in the fiscal year ended June 30, 1943. In each case we uphold the constitutionality of the Act as providing the necessary authorization for the judgments rendered. We also accept the finality given by the courts below to the administrative determinations made of the excessive profits, although the statutory situ-

---

[2] In addition to the opinions of the Circuit Courts of Appeals and District Courts cited in the text, see *Ring Construction Corp.* v. *Secretary of War,* 8 T. C. 1070; *Cohen* v. *Secretary of War,* 7 T. C. 1002; *Stein Bros. Mfg. Co.* v. *Secretary of War,* 7 T. C. 863. For discussions of the Renegotiation Act by this Court, stopping short of passing upon its constitutionality, see *Aircraft & Diesel Corp.* v. *Hirsch,* 331 U. S. 752; and *Macauley* v. *Waterman S. S. Corp.,* 327 U. S. 540.

ation as a basis for the finality of such determinations is not precisely the same in each case. By reason of the finality thus attached to the determinations made as to excessive profits in these cases, we do not pass upon the issues attempted to be raised here as to the coverage of the Act, the amount of the profits, or other matters which the petitioners might have presented to the Tax Court but did not.

In procedure which affects property rights as directly and substantially as that authorized by the Renegotiation Act, the governmental action authorized, although resting on valid constitutional grounds, is capable of gross abuse. The very finality of the administrative determinations here upheld emphasizes the seriousness of the injustices which can result from the abuse of the large powers vested in the administrative officials. We do not minimize the seriousness of complaints which thus may be cut off without relief in the name of the necessities of war and for the sake of the defense of the nation when its survival is at stake. We re-emphasize that, under these conditions, there is great need both for adequate channels of procedural due process and for careful conformity to those channels. In total war it is necessary that a civilian make sacrifices of his property and profits with at least the same fortitude as that with which a drafted soldier makes his traditional sacrifices of comfort, security and life itself. Within procedure thus authorized by the Constitution, the Congress and the Administration, and here affirmed, resulting injustices can and should be carefully examined and as far as possible relieved. In war both the raising and the support of the armed forces are essential. Both require mobilization and control under the authority of Congress. Both are entitled also to such postwar relief as may be authorized by Congress.

The Renegotiation Act was developed as a major wartime policy of Congress comparable to that of the Selective Service Act. The authority of Congress to authorize

each of them sprang from its war powers. Each was a part of a national policy adopted in time of crisis in the conduct of total global warfare by a nation dedicated to the preservation, practice and development of the maximum measure of individual freedom consistent with the unity of effort essential to success.

With the advent of such warfare, mobilized property in the form of equipment and supplies became as essential as mobilized manpower. Mobilization of effort extended not only to the uniformed armed services but to the entire population. Both Acts were a form of mobilization. The language of the Constitution authorizing such measures is broad rather than restrictive. It says "The Congress shall have Power . . . To raise and support Armies, but no appropriation of Money to that Use shall be for a longer Term than two Years; . . . ." Art. I, § 8, Cl. 12.[3] This places emphasis upon the supporting as well

---

[3] Among the many other provisions implementing the Congress and the President with powers to meet the varied demands of war, the following obviously command attention: "We the People of the United States, in Order to form a more perfect Union, . . . provide for the common defence, . . . and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America." U. S. Const. Preamble.

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; . . .

.     .     .     .     .

"To declare War, . . .

.     .     .     .     .

"To provide and maintain a Navy;

.     .     .     .     .

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, . . . ." Id. Art. I, § 8.

"The President shall be Commander in Chief of the Army and Navy of the United States, . . . ." Id. Art. II, § 2, Cl. 1.

Madison said in The Federalist, Number XLI,—General View of

as upon the raising of armies. The power of Congress as to both is inescapably express, not merely implied. The conscription of manpower is a more vital interference with the life, liberty and property of the individual than is the conscription of his property or his profits or any substitute for such conscription of them. For his hazardous, full-time service in the armed forces a soldier is paid whatever the Government deems to be a fair but modest compensation. Comparatively speaking, the manufacturer of war goods undergoes no such hazard to his personal safety as does a front-line soldier and yet the Renegotiation Act gives him far better assurance of a reasonable return for his wartime services than the Selective Service Act and all its related legislation give to the men in the armed forces. The constitutionality of the conscription of manpower for military service is beyond question. The constitutional power of Congress to support the armed forces with equipment and supplies is no less clear and sweeping.[4]  It is valid, *a fortiori.*

---

the Powers Conferred by the Constitution: "Security against foreign danger is one of the primitive objects of civil society. It is an avowed and essential object of the American Union. The powers requisite for attaining it must be effectually confided to the federal councils."

Hamilton said in The Federalist, Number XXIII,—The Necessity of a Government as Energetic as the One Proposed to the Preservation of the Union:

"The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. This power ought to be co-extensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils which are appointed to preside over the common defence."

[4] "The Constitution grants to Congress power 'to raise and support Armies,' 'to provide and maintain a Navy,' and to make all laws necessary and proper to carry these powers into execution. Under this authority Congress can draft men for battle service. *Selective Draft Law Cases,* 245 U. S. 366. Its power to draft business organizations

In view of this power "To raise and support Armies, . . ." and the power granted in the same Article of the Constitution "To make all Laws which shall

---

to support the fighting men who risk their lives can be no less." *United States* v. *Bethlehem Steel Corp.*, 315 U. S. 289, 305.

In writing of the power of Congress to pass a Conscription Act, President Lincoln said, with characteristic clearness:

"Whether a power can be implied when it is not expressed has often been the subject of controversy; but this is the first case in which the degree of effrontery has been ventured upon of denying a power which is plainly and distinctly written down in the Constitution. The Constitution declares that 'The Congress shall have power . . . to raise and support armies; but no appropriation of money to that use shall be for a longer term than two years.' The whole scope of the conscription act is 'to raise and support armies.' There is nothing else in it. . . .

". . . Do you admit that the power is given to raise and support armies, and yet insist that by this act Congress has not exercised the power in a constitutional mode?—has not done the thing in the right way? Who is to judge of this? The Constitution gives Congress the power, but it does not prescribe the mode, or expressly declare who shall prescribe it. In such case Congress must prescribe the mode, or relinquish the power. There is no alternative. . . . The power is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; nor if the men to compose the armies are entirely willing; but it is a power to raise and support armies given to Congress by the Constitution, without an 'if.'" 9 Nicolay and Hay, Works of Abraham Lincoln 75–77 (1894).

The foregoing quotation is from an opinion by President Lincoln, which was not actually issued or published by him but which was quoted to the above extent by Honorable Charles Evans Hughes, of New York, in his address on "War Powers Under the Constitution" before the American Bar Association, September 5, 1917, 42 A. B. A. Rep. 232, 234–235.

The draft was put in force both by the Union and by the Confederacy during the Civil War and its validity was sustained by the courts in both North and South. "The power of coercing the citizen to render military service, is indeed a transcendent power, in the hands of any government; but so far from being inconsistent with liberty, it is essential to its preservation." *Burroughs* v. *Peyton*, 16

be necessary and proper for carrying into Execution the foregoing Powers, . . ." the only question remaining is whether the Renegotiation Act was a law "necessary and proper for carrying into Execution" the war powers of Congress and especially its power to support armies.

It is impossible here to picture adequately all that might have been "necessary and proper" in 1942–1944 to meet the unprecedented responsibility facing Congress in this field. We do, however, catch a glimpse of it in authoritative, contemporaneous descriptions of the situation. Accordingly, we have set forth in the margin excerpts from the message of the President to the Congress upon the State of the Union, January 6, 1942,[5] from a

---

Gratt. 470, 473. See cases cited in 42 A. B. A. Rep. 234 n. 1, and see *Selective Draft Law Cases,* 245 U. S. 366; *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29; *In re Grimley,* 137 U. S. 147, 153.

[5] "Our own objectives are clear: The objective of smashing the militarism imposed by war lords upon their enslaved peoples; the objective of liberating the subjugated nations; the objective of establishing and securing freedom of speech, freedom of religion, freedom from want, and freedom from fear everywhere in the world.

"We shall not stop short of these objectives; nor shall we be satisfied merely to gain them and call it a day. I know that I speak for the American people—and I have good reason to believe I speak also for all the other peoples who fight with us—when I say that this time we are determined not only to win the war, but also to maintain the security of the peace which will follow.

"But modern methods of warfare make it a task, not only of shooting and fighting, but an even more urgent one of working and producing.

"Victory requires the actual weapons of war and the means of transporting them to a dozen points of combat.

"It will not be sufficient for us and the other united nations to produce a slightly superior supply of munitions to that of Germany, Japan, Italy, and the stolen industries in the countries which they have overrun.

"The superiority of the united nations in munitions and ships must be overwhelming—so overwhelming that the Axis nations can never hope to catch up with it. In order to attain this overwhelming

report of the Special Committee of the Senate Investigating the National Defense Program under the chairman-

superiority the United States must build planes and tanks and guns and ships to the utmost limit of our national capacity. We have the ability and capacity to produce arms not only for our own forces but also for the armies, navies, and air forces fighting on our side.

"And our overwhelming superiority of armament must be adequate to put weapons of war at the proper time into the hands of those men in the conquered nations, who stand ready to seize the first opportunity to revolt against their German and Japanese oppressors, and against the traitors in their own ranks, known by the already infamous name of 'Quislings.' As we get guns to the patriots in those lands, they too will fire shots heard 'round the world.

"This production of ours in the United States must be raised far above its present levels, even though it will mean the dislocation of the lives and occupations of millions of our own people. We must raise our sights all along the production line. Let no man say it cannot be done. It must be done—and we have undertaken to do it.

"I have just sent a letter of directive to the appropriate departments and agencies of our Government, ordering that immediate steps be taken:

"1. To increase our production rate of airplanes so rapidly that in this year, 1942, we shall produce 60,000 planes, 10,000 more than the goal set a year and a half ago. This includes 45,000 combat planes—bombers, dive-bombers, pursuit planes. The rate of increase will be continued, so that next year, 1943, we shall produce 125,000 airplanes, including 100,000 combat planes.

"2. To increase our production rate of tanks so rapidly that in this year, 1942, we shall produce 45,000 tanks; and to continue that increase so that next year, 1943, we shall produce 75,000 tanks.

"3. To increase our production rate of antiaircraft guns so rapidly that in this year, 1942, we shall produce 20,000 of them; and to continue that increase so that next year, 1943, we shall produce 35,000 antiaircraft guns.

"4. To increase our production rate of merchant ships so rapidly that in this year, 1942, we shall build 8,000,000 deadweight tons as compared with a 1941 production of 1,100,000. We shall continue that increase so that next year, 1943, we shall build 10,000,000 tons.

"These figures and similar figures for a multitude of other imple-

ship of Senator Harry S. Truman, of Missouri, March 30, 1943,[6] and from the affidavit of Robert P. Patterson, Un-

---

ments of war will give the Japanese and Nazis a little idea of just what they accomplished in the attack on Pearl Harbor.

"Our task is hard—our task is unprecedented—and the time is short. We must strain every existing armament-producing facility to the utmost. We must convert every available plant and tool to war production. That goes all the way from the greatest plants to the smallest—from the huge automobile industry to the village machine shop.

"Production for war is based on men and women—the human hands and brains which collectively we call labor. Our workers stand ready to work long hours; to turn out more in a day's work; to keep the wheels turning and the fires burning 24 hours a day, and 7 days a week. They realize well that on the speed and efficiency of their work depend the lives of their sons and their brothers on the fighting fronts.

"Production for war is based on metals and raw materials—steel, copper, rubber, aluminum, zinc, tin. Greater and greater quantities of them will have to be diverted to war purposes. Civilian use of them will have to be cut further and still further—and, in many cases, completely eliminated.

"War costs money. So far, we have hardly even begun to pay for it. We have devoted only 15 percent of our national income to national defense. As will appear in my Budget Message tomorrow, our war program for the coming fiscal year will cost $56,000,000,000 or, in other words, more than one-half of the estimated annual national income. This means taxes and bonds and bonds and taxes. It means cutting luxuries and other nonessentials. In a word, it means an all-out war by individual effort and family effort in a united country.

"Only this all-out scale of production will hasten the ultimate all-out victory. Speed will count. Lost ground can always be regained—lost time never. Speed will save lives; speed will save this Nation which is in peril; speed will save our freedom and civilization—and slowness has never been an American characteristic." 88 Cong. Rec. 32, 33–34 (1942).

[6] "Ever since the beginning of the last war there has been a constant effort to find an effective method of controlling war profits without impeding war production. The renegotiation law is the latest product of such efforts. To obtain speed we have had to use contracting methods that would never have been tolerated in peacetime.

We granted cost-plus-fixed-fee contracts where the specifications were not known or had to be subject to numerous changes or where there was no time to prepare detailed specifications. We also granted lump-sum contracts for many items which had never before been made in quantity and for which estimates of cost were mere guesses. This was particularly true of the billions of dollars of war contracts which were hastily 'shoveled' out early in January 1942.

"Is the renegotiation law a necessary and desirable method of counteracting the wasteful effects of such necessary practices in early wartime procurement? Is it being administered in such a way as to give effect to the statutory intent? What changes, if any, are needed?

"As to the necessity and desirability of the renegotiation law:

"(1) Because of the wartime need for rapid procurement of materials of war, new materials with which there has been no previous manufacturing experience and other articles previously manufactured only in relatively small quantities, some procedure for subsequent price adjustment is necessary and desirable if excessive war profits and costs are to be avoided.

"(2) Taxes alone will not do the job because (a) higher corporate tax rates are likely to encourage higher costs and discourage economical production; (b) no scheme of taxation has been devised which is sufficiently flexible to provide an incentive for efficient low-cost production; (c) a profit percentage which would fairly reward one war contractor with one type of financial structure would bankrupt a second contractor with a different financial set-up, and would provide inordinately excessive profits for a third contractor with a still different financial problem.

"(3) War contractors in most cases can protect themselves against loss by escalator clauses and other contract provisions for contingencies. The people can obtain protection in many cases only through some procedure such as renegotiation.

"(4) Experience has shown 'cost-plus' contracts to be worse than worthless in the effort to prevent excessive costs. They strongly tend to increase costs instead of the reverse.

"The administration of the renegotiation law during the first 10 months of its existence has been characterized by two significant accomplishments:

"(1) The assembly in Government of an unusual group of able, conscientious, and patriotic lawyers, accountants, and businessmen as administrators of renegotiation;

der Secretary of War, dated August 3, 1945,[7] in the form filed in each of the three cases before us.

---

"(2) The gradual education of war contractors as to the reasons for and importance of their adopting a policy of tailoring their own profits to levels which, in their own special situations, are fair both to them and to the Government.

"On the other hand, the administration of the renegotiation law and the law itself are properly subject to certain constructive criticisms:

"(1) Substantial variations in administrative policy and attitude still exist among the four departments charged with responsibility for renegotiation, although this condition has been noticeably improved in recent weeks. The existence of such a condition has created wholly unnecessary confusion, uncertainty, and misunderstanding among contractors.

"(2) Results of Navy renegotiations to date justify an inference that in its early proceedings the Navy Price Adjustment Board may have been too strongly influenced by a desire to achieve the same kind of mathematical exactness which results from a cost-plus-a-percentage-of-cost contract, a result which is inconsistent with the flexibility which was the basic purpose of the renegotiation law.

"(3) Army administration has been rendered unnecessarily cumbersome by use of military channels in the handling of an essentially business and financial enterprise.

"(4) The principles and results of renegotiation have been shrouded with entirely too much secrecy not only as to the public but as to the renegotiators themselves, causing many war contractors to be distracted by wholly unwarranted but nevertheless natural fears of the unknown.

"(5) In some cases the cost audits incident to renegotiation and taxation have been unnecessarily duplicatory.

"(6) It is impossible to recover every last dollar of excessive war profits without unnecessarily interfering with war production, and overzealous administration of the vast powers delegated by this law could be seriously detrimental to war procurement." S. Rep. No. 10, Part 5, 78th Cong., 1st Sess. 1–3 (1943).

[7] "5. The necessary result of this combination of circumstances is that the war procuring agencies cannot use normal methods of procurement. The pressing need for speed requires the abandonment of drawn-out negotiation and the careful surveys of all relevant factors which sound purchasing would otherwise require. Competition necessarily wanes and no longer offers an adequate guide to

The above-mentioned excerpts describe a demand for production of war supplies in proportions previously un-

---

the prices which should be paid. Above all, the forecasting of costs of production becomes, in large measure, a matter of informed guessing rather than of real cost analysis. This is true in the case of new products, new plants, and new producers; it is likewise true, though perhaps in lesser degree, wherever the quantities to be manufactured are sharply increased over pre-war amounts. Accordingly, advance prices quoted in good faith by manufacturers in a large number of cases have little relation to costs actually experienced in the course of production. Furthermore, many manufacturers feel unable to quote firm prices without including reserves to cover many contingencies the occurrence of which might skyrocket their costs, and so overturn all their estimates.

"6. These were the conditions of wartime procurement, after December 7, 1941, and the War Department had to force its procurement activities into their mold. Efforts were made, of course, to develop contractual devices which would minimize the paramount difficulty in estimating production costs. The cost-plus-fixed-fee contract was used where unavoidable, but this form has the disadvantage of removing financial incentives to efficiency and of imposing a heavy burden of auditing upon the Government and the contractor. Escalator clauses, permitting prices to be adjusted according to fluctuations in indices of labor and material costs, were also used but proved unworkable. Letters of intent, under which manufacture was commenced prior to the negotiation of a formal contract, helped to speed production, but could not, of course, solve the ultimate problem of decreasing costs and preventing excessive profits.

"7. Shortly after the declarations of war, both the legislative and the executive branches of the Government realized that excessive wartime profits were certain to accrue unless counter measures were taken. The evil effect of such wartime excessive profit on the morale of the fighting forces and the civilian population, as well as the unnecessary financial burden upon the Government, could not be ignored. The example of the last war was still fresh. Many war contractors realized the dangers and inequities resulting from such excessive profit, and some of them made refunds of excessive profits or voluntarily reduced their prices. In the spring of 1942, the War Department developed cost analysis units to check, so far as practicable, on production costs, and set up a price adjustment board to negotiate with contractors for voluntary price reductions and refunds of past payments. Tentative policies as to what profits were

imagined. They call for production in a volume never before approximated and at an undreamed of speed.

excessive were established and meetings with contractors had. At the same time, there came into use contract clauses providing for the renegotiation or redetermination of contract prices after an initial period of production had laid a basis for the proper estimation of costs. We hoped that these means would keep incentives to efficiency alive and at the same time would tend to eliminate undue profits such as were then coming to light.

"8. The Congress apparently felt, however, that these contractual measures, resting as they did upon the voluntary cooperation of a relatively small number of war contractors, did not provide enough certainty that excessive profits would be eliminated. The Vinson-Trammel Act, limiting profits on aircraft and ship construction, had been repealed in 1940, but an effort was made to revive it. In March, 1942, the War Department and the War Production Board opposed such legislation on the ground that a flat percentage profit limitation would impede production and would be unfair to many contractors and too generous to others. After the Case amendment imposing such a flat percentage limitation on profits from war contracts had been adopted by the House of Representatives late in March, 1942, the armed services and the War Production Board offered a substitute proposal giving statutory authority to the process of voluntary renegotiation which had been developing. Congress adopted the principle of renegotiation with which the armed services were in accord (rather than the principle of a flat percentage limitation of profits), and it also endowed the procuring agencies with power to determine excessive profits when no bilateral agreement could be reached with the contractor. I believe that this addition by the Congress of the power of unilateral action was a wise and a necessary one, and that without it renegotiation would not have accomplished anything like the results that have been achieved.

.     .     .     .     . .

"12. . . . Some conception of the vast scope of the procurement activity of the armed services after the attack on Pearl Harbor can be gained from the fact that the total expenditures of the War and Navy Departments for the one fiscal year ending June 30, 1942 ($22,905,000,000) considerably exceeded the total military and naval expenditures of the Government from 1789 through the end of World War I." Affidavit of Robert P. Patterson, Under Secretary of War, sworn to August 3, 1945.

The results amply demonstrated the infinite value of that production in winning the war. It proved to be a *sine qua non* condition of the survival of the nation. Not only was it "necessary and proper" for Congress to provide for such production in the successful conduct of the war, but it was well within the outer limits of the constitutional discretion of Congress and the President to do so under the terms of the Renegotiation Act. Accordingly, the question before us as to the constitutionality of the Renegotiation Act is not that of the power of the government to renegotiate and recapture war profits. The only questions are whether the particular method of renegotiation and the administrative procedure prescribed conformed to the constitutional limitations under which Congress was permitted to exercise its basic powers.

Our first question relates to the method of adjusting net compensation for war services through the compulsory "renegotiation" of profits under existing contracts between private parties, including recourse to unilateral orders for payments into the Treasury of the United States of such portions of those profits as were determined by the administrative officials of that Government to be "excessive profits." There were added the limitations that the contracts were for war goods in time of war, the ultimate payment for which was, in any event, to come from the Government and that, at the time of this impingement of the Renegotiation Act upon them, the contracts must not have been completed to the extent that final payments had been made on them.

One approach to the question of the constitutional power of Congress over the profits on these contracts is to recognize that Congress, in time of war, unquestionably has the fundamental power, previously discussed, to conscript men and to requisition the properties necessary and proper to enable it to raise and support its Armies. Congress furthermore has a primary obligation to bring

about whatever production of war equipment and supplies shall be necessary to win a war. Given this mission, Congress then had to choose between possible alternatives for its performance. In the light of the compelling necessity for the immediate production of vast quantities of war goods, the first alternative, all too clearly evident to the world, was that which Congress did not choose, namely, that of mobilizing the productive capacity of the nation into a governmental unit on the totalitarian model. This would have meant the conscription of property and of workmen. It would have meant the raising of supplies for the Armies in much the same manner as that in which Congress raised the manpower for such Armies. Already the nation had some units of production of military supplies in the form of arsenals, navy yards, and in the increasing number of governmentally owned, if not operated, war material plants. The production of the atomic bombs was one example of a war industry owned and operated exclusively by the Government. Faced with this ironical alternative of converting the nation in effect into a totalitarian state in order to preserve itself from totalitarian domination, that alternative was steadfastly rejected. The plan for Renegotiation of Profits which was chosen in its place by Congress appears in its true light as the very symbol of a free people united in reaching unequalled productive capacity and yet retaining the maximum of individual freedom consistent with a general mobilization of effort.

Somewhat crude in its initial statutory simplicity, the Renegotiation Act developed rapidly as the demand for war production increased beyond precedent. First approved April 28, 1942, less than five months after our declaration of war, the Act was adjusted and strengthened in its effectiveness and fairness by the numerous amendments made to it.[8] The nation previously had expe-

---

[8] See note 1, *supra.*

rienced different, but fundamentally comparable, federal regulation of civilian liberty and property in proportion to the increasing demands of modern warfare.[9]

The demands for war equipment and supplies were so great in volume, were for such new types of products, were subject to so many changes in specifications and were subject to such pressing demands for delivery that accurate advance estimates of cost were out of the question. Laying aside as undesirable the complete governmental ownership and operation of the production of war goods of all kinds, many alternative solutions were attempted. Often these called for capital expenditures by the Gov-

---

[9] *McKinley* v. *United States*, 249 U. S. 397 (regulations of local activities near federal military stations); *Northern Pacific R. Co.* v. *North Dakota*, 250 U. S. 135 (seizure and operation of railroads); *Hamilton* v. *Kentucky Distilleries and W. Co.*, 251 U. S. 146 (local liquor traffic); *Central Union Trust Co.* v. *Garvan*, 254 U. S. 554 (seizure of enemy property); *Hirabayashi* v. *United States*, 320 U. S. 81 (curfew regulations); *Yakus* v. *United States*, 321 U. S. 414 (Emergency Price Control Act); *Bowles* v. *Willingham*, 321 U. S. 503 (rent control); and *Korematsu* v. *United States*, 323 U. S. 214 (exclusion of civilians from west coast military area).

In *Hirabayashi* v. *United States, supra,* this Court said (p. 93):

"The war power of the national government is 'the power to wage war successfully.' See Charles Evans Hughes, War Powers Under the Constitution, 42 A. B. A. Rep. 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. . . . Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. . . . Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

ernment in building new plant facilities. Adhering, however, to the policy of private operation of these facilities, Congress and the Administration sought to promote a policy of wide distribution of prime contracts and subcontracts, even to comparatively high cost marginal producers of unfamiliar products. Congress sought to do everything possible to retain and encourage individual initiative in the world-wide race for the largest and quickest production of the best equipment and supplies. It clung to its faith in private enterprise. The problem was to find a fair means of compensation for the services rendered and the goods purchased. Contracts were awarded by negotiation wherever competitive bidding no longer was practicable. Contracts were let at cost-plus-a-fixed-fee. Escalator clauses were inserted. Price ceilings were established. A flat percentage limit on the profits in certain lines of production was tried. Excess profits taxes were imposed. Appeals were made for voluntary refunds of excessive profits. However, experience with these alternatives convinced the Government that contracts at fixed initial prices still provided the best incentive to production.[10]

---

[10] "20. At the beginning of the limited emergency in 1939, the only applicable statutory limits on profits from the sale of military or naval supplies were contained in the Vinson-Trammel Act of March 27, 1934, as amended (relating to naval vessels) and the Merchant Marine Act of 1936, as amended (relating to construction of merchant ships). The Act of April 3, 1939, extended percentage profit limitation to cover Army aircraft contracts. The percentage of profit allowed to contractors was lowered to approximately 8% by the Act of June 28, 1940, but the Second Supplemental National Defense Appropriation Act, 1941, enacted September 9, 1940, provided that as to aircraft the old limitation of 12% was to prevail.

"21. . . . Accordingly, the Second Revenue Act of 1940, containing the excess profits tax, suspended the profit limitation statutes applicable to Army and Navy contracts entered into after December 31, 1939, or uncompleted on that date by contractors and subcontractors subject to the new excess profits tax. Thereafter, until the

On February 16, 1942, this Court in *United States* v. *Bethlehem Steel Corp.*, 315 U. S. 289, pointed to the possibility of legislative relief.  It said (p. 309):

> "The problem óf war profits is not new.  In this country, every war we have engaged in has provided opportunities for profiteering and they have been too often scandalously seized.  See Hearings before the House Committee on Military Affairs on H. R. 3 and H. R. 5293, 74th Cong., 1st Sess., 590–598.  To meet this recurrent evil, Congress has at times taken various measures.  It has authorized price fixing. It has placed a fixed limit on profits, or has recaptured high profits through taxation.  It has expressly reserved for the Government the right to cancel contracts after they have been made.  Pursuant to Congressional authority, the Government has requisitioned existing production facilities or itself built and operated new ones to provide needed war materials.  It may be that one or some or all of these measures should be utilized more comprehensively, or that still other measures must be devised. But if the Executive is in need of additional laws by which to protect the nation against war profiteering, the Constitution has given to Congress, not to this Court, the power to make them."

Finally the compulsory renegotiation of contracts was authorized.  The procedure outlined in the Original Renegotiation Act, April 28, 1942, was rapidly perfected. As it developed it required advance consents to such renegotiation to be written into the respective contracts

passage of the Sixth Supplemental National Defense Appropriation Act of 1942, the only statutory provisions concerning war or defense contracts were those of the excess profits tax."  Affidavit of Robert P. Patterson, Under Secretary of War, sworn to August 3, 1945.

And see Hensel and McClung, *Profit Limitation Controls Prior to the Present War*, 10 Law & Contemp. Prob. 187 (1943–1944).

and subcontracts for war goods prior to their award and finally it made express provision for a redetermination of the excessive profits, in a proceeding *de novo* before the Tax Court, wherever a war goods contractor or subcontractor was aggrieved by the administrative order. Throughout these developments extended congressional and public consideration was given to the issues presented.[11]

The plan proved itself readily adaptable to the needs of the time. It called for initial contract estimates based upon the best available information at the time of enter-

---

[11] The following significant congressional hearings were publicly held:

Hearings before the Senate Committee on Finance on § 403 of Pub. L. No. 528, 77th Cong., 2d Sess. (September 22 and 23, 1942);

Hearings before a Subcommittee of the Senate Committee on Finance on § 403 of Pub. L. No. 528, 77th Cong., 2d Sess. (September 29 and 30, 1942);

Hearings before the Subcommittee of the House Committee on Appropriations on Mil. Est. App. Bill for 1944, 78th Cong., 1st Sess. 483–518, 571–580 (June 10, 1943);

Hearings before the Subcommittee of the Senate Committee on Appropriations on H. R. 2996 (Mil. Est. App. Bill for 1944), 78th Cong., 1st Sess. 22, 30–33, 125–138, 150–151 (1943);

Hearings before the House Committee on Naval Affairs, pursuant to H. R. Res. 30, Vol. 2, 78th Cong., 1st Sess. (June 10–30, 1943);

Hearings before the House Committee on Ways and Means on H. R. 2324, 2698 and 3015 (Renegotiation of War Contracts), 78th Cong., 1st Sess. (September 9–23, 1943);

Hearings before the Senate Committee on Finance on H. R. 3687 (Revenue Act of 1943), 78th Cong., 1st Sess. 49, 388–392, 402–424, 443–452, 465, 469, 598–601, 620–629, 669–684, 690–696, 925–926, 987–1111, 1121–1132 (November 29–December 15, 1943);

Hearings before the House Committee on Ways and Means on H. R. 2628 (extension of termination date of Renegotiation Act), 79th Cong., 1st Sess. (April 12–16, 1945).

In addition, private hearings and interviews appear to have been had by Congressional Committees.

The following major reports on the operation of the Renegotiation Act were issued by Congressional Committees:

ing into the contracts. Production proceeded at once on the basis of those estimates. Many factors were incapable of exact advance determination. The final net compensation, however, resulted from a renegotiation made after both parties had had the benefit of actual experience under the contract. This determination of the allowable profit was guided by many relevant factors. A list of commonly relevant factors was presented in an early administrative directive. Later such a list was enacted into the statute. Each administrative determination was made subject to a redetermination in a proceeding *de novo* in the Tax Court provided a timely petition for it was filed by the aggrieved contractor or subcontractor. The Act always has been limited in duration to a period during and shortly following the war. In most instances the Act has resulted in a disposition of cases

H. R. Rep. No. 733, 78th Cong., 1st Sess. (October 7, 1943). Report of the Committee on Naval Affairs, pursuant to H. R. Res. 30 (Renegotiation of War Contracts) ;

Sen. Rep. No. 10, Part 5, 78th Cong., 1st Sess. (March 30, 1943). Additional Report of the Special Senate Committee Investigating the National Defense Program (Renegotiation of War Contracts) ;

Sen. Rep. No. 10, Part 16, 78th Cong., 2d Sess. 40–64, 192–199 (March 4, 1944). Additional Report of the Special Senate Committee Investigating the National Defense Program (Third Annual Report) ;

H. R. Rep. No. 871, 78th Cong., 1st Sess. 75–90 (November 18, 1943), on H. R. 3687 (Revenue Bill of 1943) ;

Sen. Rep. No. 627, 78th Cong., 1st Sess. 98–119 (December 22, 1943), on H. R. 3687 (Revenue Bill of 1943) ;

H. R. Rep. No. 1079, 78th Cong., 2d Sess. 34–39, 76–88 (February 4, 1944), on H. R. 3687 (Conference Report on Revenue Act of 1943).

See also:

Renegotiation of War Contracts—Law, Debates and Other Legislative Materials—Compiled for the use of the House Committee on Ways and Means, 78th Cong., 1st Sess. (1943) ;

Data on Renegotiation of Contracts, Senate Committee on Finance (December 9, 1943).

by agreements reached between the parties.[12]  The controversies which have survived to this day are, in large measure, not those dealing with the constitutionality of the general effect of the plan or even with the finality of redetermination under the prescribed administrative procedure, but are those arising out of an alleged abuse of discretion in its administration.

### THE RENEGOTIATION ACT.

While there have been six legislative steps[13] in the development of the Renegotiation Act, the portions of it that are especially material here consist of certain

---

[12] In its brief filed jointly in the present cases the Government has submitted the following statement as to the results of renegotiation:

"11. *The results of renegotiation:* We are advised by the War Contracts Price Adjustment Board that as of June 30, 1947, 118,101 contractors had been assigned for renegotiation with respect to 1942 through 1946 fiscal years, and contracts aggregating over $190,000,-000,000 (excluding contractors eliminated because of exemptions or non-coverage) were subjected to renegotiation.  Of the total assignments, 115,535 (or 97.8%) were completed as of June 30, 1947.  Out of the 115,535 completed assignments, 85,037 (or 73.6%) resulted in cancellations or clearances indicating that no excessive profits had been made or that the contractor was found to be exempt from renegotiation; 28,889 (or 25%) resulted in bilateral refund agreements between the Government and the contractor; 1,609 (or 1.4%) resulted in unilateral determinations by the Departments or the War Contracts Price Adjustment Board.  Of the 30,498 assignments involving determinations of excessive profits, 1,609 (or 5.28%) were unilateral determinations and 28,889 (or 94.72%) were bilateral.

"Also as of June 30, 1947, the gross recoveries through renegotiation amounted to some $10,434,637,000, and the estimated net recovery (after deduction of the federal tax credit allowed contractors on renegotiation refunds) amounted to $3,130,391,000.  Of the total gross recoveries of $10,434,637,000, some $895,493,000 (or 8.58%) were involved in unilateral determinations and the rest were recovered by voluntary agreement."

[13] See note 1, *supra.*

language in the so-called Original Renegotiation Act contained in § 403 of the Sixth Supplemental Defense Appropriations Act, approved April 28, 1942;[14] in the amendments made by the Revenue Act of 1942, October 21, 1942;[15] and its further amendment and substantial expansion by § 701 (b) of the Revenue Act of 1943, February 25, 1944.[16] In that form it is sometimes called the Second Renegotiation Act, but the entire § 403, both in its original and amended forms may be properly cited as the "Renegotiation Act."[17] In the proceedings leading up to the enactment of the Original Renegotiation Act, an alternative in the form of a rigid limitation of profits was rejected in favor of the more flexible definition embodied in the term "excessive profits."[18] The War Department Directive of August 10, 1942, entitled "Principles, Policy and Procedure to be Followed in Renegotiation" promptly stated the factors to be stressed in determining excessive profits. This directive was introduced in the hearings held by the Finance Committee of the Senate in September[19] and thus was before the Senate at the time of the passage of the above-mentioned Reve-

---

[14] For relevant excerpts from its text, see Appendix I, *infra*, p. 793.

[15] For relevant excerpts from its text, see Appendix II, *infra*, p. 795.

[16] For relevant excerpts from its text, see Appendix III, *infra*, p. 798.

[17] See § 403 (l) in note 1, *supra*.

[18] In the House of Representatives, the Case Amendment, providing in effect a limitation of 6% on war profits was adopted without debate. 88 Cong. Rec. 3139–3140 (1942). Before the Senate Subcommittee on Appropriations strong objection was made to this provision by the representatives of the Government and its omission was recommended by the Senate Committee on Appropriations. After ample consideration it was omitted in the Act as passed. 88 Cong. Rec. 3378–3405; 3582–3599; 3647–3662; 3666 (1942), and see H. R. Rep. No. 2030, 77th Cong., 2d Sess. 8–10 (1942).

[19] Hearings before the Subcommittee of the Senate Committee on Finance on Pub. L. No. 528, 77th Cong., 2d Sess. 16–28 (September 29, 1942).

nue Act of 1942, October 21, 1942, which made important amendments in the Renegotiation Act.

The "Joint Statement by the War, Navy, and Treasury Departments and the Maritime Commission—Purposes, Principles, Policies, and Interpretations" dealing with the Renegotiation Act was issued March 31, 1943. This was considered at the Hearings before the House Committee on Naval Affairs, 78th Cong., 1st Sess., Vol. 2, pp. 469, et seq., 1025–1039, especially 1028–1029 (1943). Finally the above-mentioned Revenue Act of 1943, 58 Stat. 21, on February 25, 1944, largely incorporated these views in § 403 (a) (4) (A),[20] thus indicating congressional approval of this administrative practice and further assuring continuity of it during the balance of the life of the Act.

### DELEGATION OF AUTHORITY UNDER THE RENEGOTIATION ACT.

The petitioners contend that the Renegotiation Act unconstitutionally attempted to delegate legislative power to administrative officials. The United States does not contest the right of the courts to decide the issues as to the validity of the Act on its face in the present cases, each of which was instituted after the petitioners' respective rights to a Tax Court redetermination had been forfeited. We find no reason for not reaching here the constitutionality of the Act. Cf. *Aircraft & Diesel Corp.* v. *Hirsch,* 331 U. S. 752; *Wade* v. *Stimson,* 331 U. S. 793; *Macauley* v. *Waterman S. S. Corp.,* 327 U. S. 540; *Yakus* v. *United States,* 321 U. S. 414.

The constitutional argument is based upon the claim that the delegation of authority contained in the Act carried with it too slight a definition of legislative policy and standards. Accordingly, it is contended that the resulting determination of excessive profits which were

---

[20] See Appendix III, *infra*, p. 798.

claimed by the United States amounted to an uncon-
stitutional exercise of legislative power by an adminis-
trative official instead of a mere exercise of administrative
discretion under valid legislative authority. We hold
that the authorization was constitutional. Certainly as
spelled out in § 403 (a) (4) (A)[21] of the Second Renego-
tiation Act with respect to fiscal years ending after June
30, 1943, there can be no objection on this ground. This
question, therefore, relates to the delegation of authority
as made by the Act before the effective date of the Second
Renegotiation Act. The argument on this question is
limited to the *Lichter* and *Alexander* cases, inasmuch as
the excessive profits determined to exist in the *Pownall*
case were so found by the War Contracts Price Adjust-
ment Board under the Second Renegotiation Act.

### 1. The Statutory Language.

The Original Renegotiation Act,[22] approved April 28,
1942, provided in § 403 (b), (c), (d) and (e) for the rene-
gotiation of all contracts and subcontracts thereafter made
and also of all contracts and subcontracts theretofore
made by the War Department, the Navy Department or
the Maritime Commission, whether or not such contracts
or subcontracts contained a renegotiation or recapture
clause, provided the final payment pursuant thereto had
not been made prior to April 28, 1942. The renegotiation
was to be done by the Secretary of the Department con-
cerned. For this purpose the Chairman of the Maritime
Commission was included in the term "Secretary." The
services of the Bureau of Internal Revenue were made
available upon the request of each Secretary, subject to
the consent of the Secretary of the Treasury, for the pur-
poses of making examinations and determinations with

---

[21] See Appendix III, *infra*, p. 798.
[22] See Appendix I, *infra*, p. 793.

respect to profits under the Section. The Secretary of each Department was authorized and directed, whenever in his opinion excessive profits had been realized or were likely to be realized from any contract with such Department or from any subcontract thereunder, to require the contractor or subcontractor to renegotiate the contract price. In case any amount of the contract price was found as a result of such renegotiation to represent "excessive profits" which had been paid to the contractor or subcontractor, the Secretary was authorized to recover them.

There was no express definition of the term "excessive profits" in the Original Renegotiation Act. However, in its § 403 (b),[23] there was a relevant statement in connection with the renegotiation clauses required to be inserted in future contracts and subcontracts for an amount in excess of $100,000 each. The Secretary was required to insert in such contracts, thereafter made by his Department, "a provision for the renegotiation of the contract price at a period or periods when, in the judgment of the Secretary, the profits can be determined with reasonable certainty; . . . ." Contractors were also to be required to insert a like provision in their subcontracts. This statement indicated a relationship between current "excessive profits" and those which later might be determined with "reasonable certainty."

Also, in § 403 (d)[24] it was provided that, in renegotiating a contract price or determining excessive profits, the Secretaries of the respective Departments should not make allowances "for any salaries, bonuses, or other compensation paid by a contractor to its officers or employees in excess of a reasonable amount, . . ." nor "for any excessive reserves set up by the contractor or for any costs

---

[23] See Appendix I, *infra*, p. 793.
[24] See Appendix I, *infra*, p. 794.

incurred by the contractor which are excessive and unreasonable."

The amendments made to this Section by the Revenue Act of 1942,[25] approved October 21, 1942, were made effective as of April 28, 1942. At the time they were approved, Congress had knowledge of the War Department Directive of August 10, 1942,[26] which had been put into effect stressing certain factors which the Secretary emphasized in determining excessive profits. While Congress then made several amendments to § 403, those amendments did not alter the effect of such directive in this particular. Among the amendments that were then added there was the following purported definition of "excessive profits": "The term 'excessive profits' means any amount of a contract or subcontract price which is found as a result of renegotiation to represent excessive profits." In the light of the existing administrative practices this at least expressed a congressional satisfaction with the existing specificity of the Act. The amendment made to § 403 (c) (3)[27] required the recognition of exclusions and deductions of the character afforded by certain provisions of the Internal Revenue Code. The amendment to § 403 (c) (5)[28] provided also that the Secretaries, by joint regulation, might prescribe the form and detail in which certain data might be filed by contractors and subcontractors bearing upon their profits under their contracts. This material concerned "statements of actual costs of production" and "other financial statements for

---

[25] See Appendix II, *infra*, p. 795.

[26] Published as part of the material submitted by Under Secretary of War Robert P. Patterson at the Hearings on the Renegotiation of Contracts before a Subcommittee of the Senate Committee on Finance on § 403 of Pub. L. No. 528, 77th Cong., 2d Sess. 28, 34–43 (September 29, 1942).

[27] See Appendix II, *infra*, p. 796.

[28] See Appendix II, *infra*, p. 797.

any prior fiscal year or years." Under some circumstances, in the absence of a notice from the Secretary and in the absence of the commencement of renegotiations, it was provided that "the contractor or subcontractor shall not thereafter be required to renegotiate to eliminate excessive profits realized from any such contract or subcontract during such fiscal year or years and any liabilities of the contractor or subcontractor for excessive profits realized during such period shall be thereby discharged." A new subsection (i)[29] was added containing new exceptions and exemptions from the Act. The "Joint Statement by the War, Navy, and Treasury Department and the Maritime Commission—Purposes, Principles, Policies, and Interpretations" issued March 31, 1943,[30] similarly contributed definiteness to the current administrative practice.

### 2. The Validity of the Delegation of Authority.

It is in the light of these statutory provisions and administrative practices that we must determine whether the Renegotiation Act made an unconstitutional delegation of legislative power. On the basis of (a) the nature of the particular constitutional powers being employed, (b) the current administrative practices later incorporated into the Act and (c) the adequacy of the statutory term "excessive profits" as used in this context, we hold that the authority granted was a lawful delegation of administrative authority and not an unconstitutional delegation of legislative power.

(a) *A constitutional power implies a power of delegation of authority under it sufficient to effect its purposes.*—This power is especially significant in connection

---

[29] See Appendix II, *infra*, p. 798.

[30] See Hearings before the House Committee on Naval Affairs, 78th Cong., 1st Sess., Vol. 2, pp. 469, *et seq.*, 1025–1039, especially 1028–1029 (1943).

with constitutional war powers under which the exercise of broad discretion as to methods to be employed may be essential to an effective use of its war powers by Congress. The degree to which Congress must specify its policies and standards in order that the administrative authority granted may not be an unconstitutional delegation of its own legislative power is not capable of precise definition. In peace or in war it is essential that the Constitution be scrupulously obeyed,[31] and particularly that the respective branches of the Government keep within the powers assigned to each by the Constitution. On the other hand, it is of the highest importance that the fundamental purposes of the Constitution be kept in mind and given effect in order that, through the Constitution, the people of the United States may in time of war as in peace bring to the support of those purposes the full force of their

---

[31] "The question remains: What may be deemed to be the force and effect in time of war of the restrictive provisions contained in the constitution with respect to the exercise of federal authority? It is manifest, at once, that the great organs of the National Government retain and perform their functions as the constitution prescribes. Senators and Representatives are qualified and chosen as provided in the constitution and the legislative power vested in the Congress must be exercised in the required manner. The President is still the constitutional Executive, elected in the manner provided and subject to the restraints imposed upon his office. The judicial power of the United States continues to be vested in one Supreme Court and such inferior courts as Congress has ordained. Again, apart from the provisions fixing the framework of the Government, there are limitations which by reason of their express terms or by necessary implication must be regarded as applicable as well in war as in peace. Thus one of the expressed objects of the power granted to Congress 'to lay and collect Taxes, Duties, Imposts, and Excises' is to 'provide for the common defence,' and it cannot be doubted that taxes laid for this purpose, that is, to support the army and navy and to provide the means for military operations, must be laid subject to the constitutional restrictions." Address by Honorable Charles E. Hughes, of New York, on "War Powers Under the Constitution," September 5, 1917, 42 A. B. A. Rep. 232, 241–242.

united action. In time of crisis nothing could be more tragic and less expressive of the intent of the people than so to construe their Constitution that by its own terms it would substantially hinder rather than help them in defending their national safety.

In an address by Honorable Charles E. Hughes, of New York, on "War Powers Under The Constitution," September 5, 1917, 42 A. B. A. Rep. 232, 238–239, 247–248, he said:

> "The power to wage war is the power to wage war successfully. The framers of the constitution were under no illusions as to war. They had emerged from a long struggle which had taught them the weakness of a mere confederation, and they had no hope that they could hold what they had won save as they established a Union which could fight with the strength of one people under one government entrusted with the common defence. In equipping the National Government with the needed authority in war, they tolerated no limitations inconsistent with that object, as they realized that the very existence of the Nation might be at stake and that every resource of the people must be at command. . . .

> .    .    .    .    .

> "The extraordinary circumstances of war may bring particular business[es] and enterprises clearly into the category of those which are affected with a public interest and which demand immediate and thoroughgoing public regulation. The production and distribution of foodstuffs, articles of prime necessity, those which have direct relation to military efficiency, those which are absolutely required for the support of the people during the stress of conflict, are plainly of this sort. Reasonable regulations to safeguard the resources upon which we depend for military success must be regarded as being within the powers con-

fided to Congress to enable it to prosecute a successful war.

"In the words of the Supreme Court: 'It is also settled beyond dispute that the Constitution is not self-destructive. In other words, that the power which it confers on the one hand it does not immediately take away on the other. . . .' [32] This was said in relation to the taxing power. Having been granted in express terms, the Court held it had not been taken away by the due process clause of the Fifth Amendment. As the Supreme Court put it in another case: 'the Constitution does not conflict with itself by conferring upon the one hand a taxing power and taking the same power away on the other by the limitations of the due process clause.' [33]

"Similarly, it may be said that the power has been expressly given to Congress to prosecute war, and to pass all laws which shall be necessary and proper for carrying that power into execution. That power explicitly conferred and absolutely essential to the safety of the Nation is not destroyed or impaired by any later provision of the constitution or by any one of the amendments. These may all be construed so as to avoid making the constitution self-destructive, so as to preserve the rights of the citizen from unwarrantable attack, while assuring beyond all hazard the common defence and the perpetuity of our liberties. These rest upon the preservation of the nation.

"It has been said that the constitution marches. That is, there are constantly new applications of unchanged powers, and it is ascertained that in novel and complex situations, the old grants contain, in

[32] *Billings* v. *United States*, 232 U. S. 261, 282.

[33] *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 24.

their general words and true significance, needed and adequate authority. So, also, we have a *fighting* constitution. We cannot at this time fail to appreciate the wisdom of the fathers, as under this charter, one hundred and thirty years old—the constitution of Washington—the people of the United States fight with the power of unity,—as we fight for the freedom of our children and that hereafter the sword of autocrats may never threaten the world."

The war powers of Congress and the President are only those which are to be derived from the Constitution but, in the light of the language just quoted, the primary implication of a war power is that it shall be an effective power to wage the war successfully. Thus, while the constitutional structure and controls of our Government are our guides equally in war and in peace, they must be read with the realistic purposes of the entire instrument fully in mind.[34]

In 1942, in the early stages of total global warfare, the exercise of a war power such as the power "To raise and support Armies, . . ." and "To provide and maintain a Navy; . . . ," called for the production by us of war goods in unprecedented volume with the utmost speed, combined with flexibility of control over the product and with a high degree of initiative on the part of the producers. Faced with the need to exercise that power, the question was whether it was beyond the constitutional power of Congress to delegate to the high officials named therein the discretion contained in the Original Renegotiation Act of April 28, 1942, and the amendments of October

---

[34] "We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, *provide for the common defence,* promote the general Welfare, and *secure the Blessings of Liberty to ourselves and our Posterity,* do ordain and establish this Constitution for the United States of America." (Italics supplied.) U. S. Const. Preamble.

21, 1942. We believe that the administrative authority there granted was well within the constitutional war powers then being put to their predestined uses.

(b) *The administrative practices developed under the Renegotiation Act demonstrated the definitive adequacy of the term "excessive profits" as used in the Act.*—The administrative practices currently developed under the Act in interpreting the term "excessive profits" appear to have come well within the scope of the congressional policy. We have referred above to the War Department Directive of August 10, 1942,[35] and to the Joint Departmental Statement of March 31, 1943,[36] both of which were placed before appropriate Congressional Committees. These clearly stated practices are evidence of a current correct understanding of the congressional intent. This appears from the fact that the congressional action of October 21, 1942, made effective as of April 28, 1942, was taken in the light of the above-mentioned directive and without restricting its effect. Furthermore, the congressional action taken February 25, 1944, and made effective for the fiscal years ending after June 30, 1943, substantially incorporated into the statute the administrative practice shown in the Joint Departmental Statement of March 31, 1943. It thus became an express congressional definition of the factors appropriate for consideration in determining excessive profits, whereas before it was an administrative interpretation of "excessive profits" to the same effect.

(c) *The statutory term "excessive profits," in its context, was a sufficient expression of legislative policy and standards to render it constitutional.*—The fact that this term later was further defined both by administrative action and by statutory amendment indicates the prob-

---

[35] See notes 19 and 26, *supra.*

[36] See note 30, *supra.*

able desirability of such added definition, but it does not demonstrate that such further definition was a constitutional necessity essential to the validity of the original exercise by Congress of its war powers in initiating a new solution of an unprecedented problem. The fact that the congressional definition confirmed the administrative practice which already was in effect under the original statutory language tends to show that a statutory definition was not necessary in order to give effect to the congressional intent.

In 1942 the imposition of excess profits taxes was a procedure already familiar to Congress, both as an emergency procedure to raise funds for extraordinary wartime expenditures, and as one to meet the needs of peace. The recapture of excess income as applied by Congress to the railroads had been upheld by this Court in 1924. *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456. The opinions of this Court in *Yakus* v. *United States,* 321 U. S. 414; *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 529–542; and *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 413–433, are not in conflict with our present position.

The policy and purpose of Congress in choosing the renegotiation of profits as an alternative to cost-plus contracts, to flat percentage limitations of profits, and to 100% excess profits taxes was an attempt to determine a fair return on war contracts, under conditions where actual experience alone could disclose what was fair and when the primary national need was for the immediate production of unprecedented quantities of new products. The action of Congress was an expression of its well-considered judgment as to the degree of administrative authority which it was necessary to grant in order to effectuate its policy. This action of Congress came within the scope of its discretion as described by Chief Justice Hughes in *Panama Refining Co.* v. *Ryan, supra,* at p. 421:

"Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility."

It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. "If Congress shall lay down by legislative act an intelligible principle . . . such legislative action is not a forbidden delegation of legislative power." *Hampton Co.* v. *United States,* 276 U. S. 394, 409. Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. "They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear." *American Power & Light Co.* v. *S. E. C.,* 329 U. S. 90, 104. The purpose of the Renegotiation Act and its factual background establish a sufficient meaning for "excessive profits" as those words are used in practice.[37] The word "excessive" appears twice in the

---

[37] Excessive means: "Characterized by, or exhibiting, excess; as: *a* Exceeding what is usual or proper; overmuch. *b* Greater than the usual amount or degree; exceptional; very great." Webster's New International Dictionary, 2d ed. (1938).

Eighth Amendment to the Constitution: "Excessive bail shall not be required, nor excessive fines imposed, . . . ." In the Original Renegotiation Act, § 403 (d),[38] there were expressly disallowed to the contractor in determining his profits "compensation paid by a contractor to its officers or employees in excess of a reasonable amount, . . ." and "any costs incurred by the contractor which are excessive and unreasonable." "Excessive profits are those in excess of reasonable profits." *Spaulding* v. *Douglas Aircraft Co.,* 154 F. 2d 419, 423.

The following, somewhat comparable, legislative specifications are among those which have been held to state a sufficiently definite standard for administrative action:

"Just and reasonable" rates for sales of natural gas, *Federal Power Comm'n* v. *Hope Gas Co.,* 320 U. S. 591, 600–601; "public interest, convenience, or necessity" in establishing rules and regulations under the Federal Communications Act, *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 225–226; prices yielding a "fair return" or the "fair value" of property, *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381, 397–398; "unfair methods of competition" distinct from offenses defined under the common law, *Federal Trade Comm'n* v. *Keppel & Bro.,* 291 U. S. 304, 311–312, 314; "just and reasonable" rates for the services of commission men, *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420, 431; and "fair and reasonable" rent for premises, with final determination in the courts, *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242, 243, 248–250.

### 3. Methods Prescribed and Limitations Imposed on the Administration.

The methods prescribed and the limitations imposed by Congress upon the contemplated administrative action

---

[38] See Appendix I, *infra,* p. 794.

are helpful. The Act is confined to the duration of the war or to a short time thereafter. Renegotiation, from the beginning, has been confined to the elimination of excessive profits from contracts and subcontracts with certain governmental departments directly related to the conduct of the war. By subsequent amendments the scope of the Act was limited by further express exceptions and exemptions. The administrative officials to whom authority was granted were clearly specified and were all officials of high governmental responsibility. Each was required to act whenever he found excessive profits existed under the conditions defined. The provisions for a redetermination of excess profits by the Tax Court *de novo* are discussed later. They likewise imposed important limitations on the allowable recoveries.

Accordingly, we hold that the delegation of authority here in issue, under the Renegotiation Act in its several forms, was a constitutional definition of administrative authority and not an unconstitutional delegation of legislative power.

### THE RENEGOTIATION OF WAR CONTRACTS WAS NOT A TAKING OF PRIVATE PROPERTY FOR PUBLIC USE.

The recovery by the Government of excessive profits received or receivable upon war contracts is in the nature of the regulation of maximum prices under war contracts or the collection of excess profits taxes, rather than the requisitioning or condemnation of private property for public use. One of the primary purposes of the renegotiation plan for redetermining the allowable profit on contracts for the production of war goods by private persons was the avoidance of requisitioning or condemnation proceedings leading to governmental ownership and operation of the plants producing war materials. A refund to the Government of excessive earnings of railroad carriers under the recapture provisions of § 15a of the

Transportation Act of 1920, 41 Stat. 488, has been sustained by this Court. *Dayton-Goose Creek R. Co.* v. *United States,* 263 U. S. 456. The collection of renegotiated excessive profits on a war subcontract also is not in the nature of a penalty and is not a deprivation of a subcontractor of his property without due process of law in violation of the Fifth Amendment.

THE RENEGOTIATION ACT, INCLUDING ITS AMENDMENTS, HAS BEEN PROPERLY APPLIED TO CONTRACTS ENTERED INTO BEFORE ITS AND THEIR RESPECTIVE ENACTMENTS.

The excessive profits claimed by the Government in these cases arose out of contracts between the respective petitioners and other private parties. None arose out of contracts made directly with the Government itself. All the contracts, however, related to subject matter within the meaning of the Renegotiation Act in its respective stages. The contracts all were of the type which came to be known, under the Act, as subcontracts. All, except four in the *Lichter* case, were entered into after the enactment of the Original Renegotiation Act, April 28, 1942, and on those four, the final payment had not been made by that date. We therefore do not have before us an issue as to the recovery of excessive profits on any contract made directly with the Government nor on any subcontract upon which final payment had been made before April 28, 1942, although relating to war goods made or services performed after the declaration of war, December 8, 1941. Congress limited the Renegotiation Act to future contracts and to contracts already existing but pursuant to which final payments had not been made prior to the date of enactment of the original Act. These included contracts made directly with the Government and also subcontracts such as those here involved.

We uphold the right of the Government to recover excessive profits on each of the contracts before us. This right exists as to such excessive profits whether they arose from contracts made before or after the passage of the Act. A contract is equally a war contract in either event and, if uncompleted to the extent that the final payment has not yet been made, the recovery of excessive profits derived from it may be authorized as has been done here.

While the Original Renegotiation Act may not have expressly defined some of the contracts before us as subcontracts, the Act of October 21, 1942, in its amendments effective as of April 28, 1942, did so. Accordingly, the contracts entered into between private parties in the *Alexander* case between April 28, 1942, and October 21, 1942, come within the scope of the Renegotiation Act.

### THE TAX COURT REMEDY.

Before the amendments incorporated in it on February 25, 1944, by the Revenue Act of 1943 (the so-called Second Renegotiation Act) the Original Renegotiation Act, as theretofore amended, did not provide expressly for a review or redetermination of the initial determination of the excess profits authorized to be made by the respective Secretaries. The 1944 amendments added not merely an express statement of factors to be taken into consideration in determining excessive profits (§ 403 (a) (4) (A)),[39] but also created a War Contracts Price Adjustment Board (§ 403 (d) (1))[40] to make such determinations in the future. Also, it provided expressly for petitions to be filed with the Tax Court to secure redeterminations of the orders of such Board. (§ 403 (e) (1).)[41] It expressly

---

[39] See Appendix III, *infra*, p. 799.
[40] See Appendix III, *infra*, p. 801.
[41] See Appendix III, *infra*, p. 801.

stated that "A proceeding before the Tax Court to finally determine the amount, if any, of excessive profits shall not be treated as a proceeding to review the determination of the Board, but shall be treated as a proceeding de novo." (§ 403 (e) (1).) It provided also that "In the absence of the filing of a petition with The Tax Court of the United States under the provisions of and within the time limit prescribed in subsection (e) (1), such order [of the Board] shall be final and conclusive and shall not be subject to review or redetermination by any court or other agency." (§ 403 (c) (1).)[42] All of the determinations in the cases before us were made after February 25, 1944, and those in the *Pownall* case were made on behalf of the Board. The above procedure under § 403 (e) (1) accordingly was open to the petitioners in the *Pownall* case but they did not file a petition with the Tax Court.

In addition to the above procedures affecting future determinations of excessive profits to be made by the Board, the Second Renegotiation Act also made express provisions, in § 403 (e) (2),[43] for a redetermination by the Tax Court of excessive profits determined to exist by the respective Secretaries. These provisions applied first to any determinations made by a Secretary *prior to* February 25, 1944, with respect to a fiscal year ending before July 1, 1943. In those instances a petition for redetermination by the Tax Court was permitted to be filed within 90 days after February 25, 1944. We have no such case before us. These provisions applied also to any determination made by a Secretary *after* February 25, 1944, with respect to a fiscal year ending before July 1, 1943. In that event, a petition for redetermination by the Tax Court was permitted to be filed within 90 days after the date of the

---

[42] See Appendix III, *infra*, p. 800.
[43] See Appendix III, *infra*, p. 801.

redetermination. We have such situations in the *Lichter* and *Alexander* cases.

No petitions were filed with the Tax Court in any of the cases before us, and the time for doing so has expired. Accordingly, here, as in *Aircraft & Diesel Corp.* v. *Hirsch,* 331 U. S. 752, 771, we do not have before us, and we do not express an opinion upon, the finality which would have attached to a redetermination by the Tax Court if such a redetermination had been sought and made. We have only the situations presented by the respective failures of the petitioners to resort to the Tax Court in the face of the express statutory provisions made for such administrative relief.

As to the effect of the statute and of the course of action taken, we hold that the statute did afford procedural due process to the respective petitioners but that none of them made use of the procedure so provided for them. Consistent with the primary need for speed and definiteness in these matters, the original administrative determinations by the respective Secretaries or by the Board were intended primarily as renegotiations in the course of which the interested parties were to have an opportunity to reach an agreement with the Government or in connection with which the Government, in the absence of such an agreement, might announce its unilateral determination of the amount of excessive profit claimed by the United States. This initial proceeding was not required to be a formal proceeding producing a record for review by some other authority. In lieu of such a procedure for review, the Second Renegotiation Act provided an adequate opportunity for a redetermination of the excessive profits, if any, *de novo* by the Tax Court. "The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requi-

site hearing is held before the final order becomes effective." *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 152–153.

We uphold the decisions below and the contentions of the Government to the effect that the statutory provision thus made for a petition to the Tax Court was not, in any case before us, an optional or alternative procedure. It provided the one and only procedure to secure a redetermination of the excessive profits which had been determined to exist by the orders of the respective Secretaries or of the Board in the cases before us. Failure of the respective petitioners to exhaust that procedure has left them with no right to present here issues such as those as to coverage and the amount of profits which might have been presented there. Accordingly, there is excluded from our consideration in this proceeding the contention in the *Lichter* case that the petitioners' subcontracts were exempt from renegotiation on the ground that they were subcontracts under prime contracts with a Department of the Government and had been awarded to them as the result of competitive bidding for the construction of buildings and facilities. There is excluded also, for example, the contention in the *Pownall* case that petitioners' contracts which were for amounts under $100,000 each were not subject to renegotiation. Likewise, in the *Alexander* case, there is excluded the petitioner's contention that it had not made excessive profits within the meaning of the statute and that its contracts for processing wool were not "subcontracts" within the meaning of the Original Renegotiation Act.

For these reasons, we uphold the constitutionality of the Renegotiation Act on its face as authority for the recovery of excessive profits as ordered in the three respective cases before us, and we hold that the respective petitioners do not have the right to present questions

as to the coverage of that Act, as to the amount of excessive profits adjudged to be due from them or as to other comparable issues which might have been presented by them to the Tax Court upon a timely petition to that court for a redetermination of excessive profits, if any.

Accordingly, in each of the cases before us, the judgment of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE MURPHY concurs in the result in these cases.

MR. JUSTICE JACKSON concurs in the result in the *Pownall* case, but dissents in the *Lichter* and *Alexander* cases.

[For opinion of MR. JUSTICE DOUGLAS, dissenting in part, see *post,* p. 802.]

## APPENDIX.

### I.

Excerpts from the so-called Original or First Renegotiation Act, § 403, Sixth Supplemental National Defense Appropriation Act, 1942, approved April 28, 1942, c. 247, 56 Stat. 226, 245–246.

"(a) . . . For the purposes of subsections (d) and (e) of this section, the term 'contract' includes a subcontract and the term 'contractor' includes a subcontractor.

"(b) The Secretary of each Department is authorized and directed to insert in any contract for an amount in excess of $100,000 hereafter made by such Department (1) a provision for the renegotiation of the contract price at a period or periods when, in the judgment of the Secretary, the profits can be determined with reasonable certainty; (2) a provision for the retention by the United States or the repayment to the United States of (A) any amount of the contract price which is found as a result of such renegotiation to represent excessive profits and (B) an amount of the contract price equal to the amount of the reduction in the contract price of any subcontract

under such contract pursuant to the renegotiation of such subcontract as provided in clause (3) of this subsection; and (3) a provision requiring the contractor to insert in each subcontract for an amount in excess of $100,000 made by him under such contract (A) a provision for the renegotiation by such Secretary and the subcontractor of the contract price of the subcontract at a period or periods when, in the judgment of the Secretary, the profits can be determined with reasonable certainty, (B) a provision for the retention by the United States or the repayment to the United States of any amount of the contract price of the subcontract which is found as a result of such renegotiation, to represent excessive profits, and (C) a provision for relieving the contractor from any liability to the subcontractor on account of any amount so retained by or repaid to the United States.

"(c) The Secretary of each Department is authorized and directed, whenever in his opinion excessive profits have been realized, or are likely to be realized, from any contract with such Department or from any subcontract thereunder, (1) to require the contractor or subcontractor to renegotiate the contract price, (2) to withhold from the contractor or subcontractor any amount of the contract price which is found as a result of such renegotiation to represent excessive profits, and (3) in case any amount of the contract price found as a result of such renegotiation to represent excessive profits shall have been paid to the contractor or subcontractor, to recover such amount from such contractor or subcontractor. Such contractor or subcontractor shall be deemed to be indebted to the United States for any amount which such Secretary is authorized to recover from such contractor or subcontractor under this subsection, and such Secretary may bring actions in the appropriate courts of the United States to recover such amount on behalf of the United States. All amounts recovered under this subsection shall be covered into the Treasury as miscellaneous receipts. This subsection shall be applicable to all contracts and subcontracts hereafter made and to all contracts and subcontracts heretofore made, whether or not such contracts or subcontracts contain a renegotiation or recapture clause, provided that final payment pursuant to such contract or subcontract has not been made prior to the date of enactment of this Act.

"(d) In renegotiating a contract price or determining excessive profits for the purposes of this section, the Secretaries of the respective Departments shall not make any allowance for any salaries, bonuses, or other compensation paid by a contractor to its officers or employees in excess of a reasonable amount, nor shall they make

allowance for any excessive reserves set up by the contractor or for any costs incurred by the contractor which are excessive and unreasonable. For the purpose of ascertaining whether such unreasonable compensation has been or is being paid, or whether such excessive reserves have been or are being set up, or whether any excessive and unreasonable costs have been or are being incurred, each such Secretary shall have the same powers with respect to any such contractor that an agency designated by the President to exercise the powers conferred by title XIII of the Second War Powers Act, 1942, has with respect to any contractor to whom such title is applicable. . . .

"(e) In addition to the powers conferred by existing law, the Secretary of each Department shall have the right to demand of any contractor who holds contracts with respect to which the provisions of this section are applicable in an aggregate amount in excess of $100,000, statements of actual costs of production and such other financial statements, at such times and in such form and detail, as such Secretary may require. . . ."

.    .    .    .    .

56 Stat. 245.

## II.

Excerpts from Title VIII, Renegotiation of War Contracts, Revenue Act of 1942, approved October 21, 1942, c. 619, 56 Stat. 798, 982–985, 26 U. S. C. A. *Internal Revenue Acts Beginning 1940,* Revenue Act of 1942, § 801, p. 376.

Section 801 of the Revenue Act of 1942 amended the Section in several particulars, all effective as of April 28, 1942. Among the amendments were certain additions or changes contained in § 403 (a), § 403 (c) and § 403 (i) and reading as follows:

"SEC. 801. RENEGOTIATION OF WAR CONTRACTS.

"(a) Subsections (a), (b), and (c) of section 403 of the Sixth Supplemental National Defense Appropriation Act (Public 528, 77th Cong., 2d Sess.), are amended to read as follows:

"Sec. 403. (a) For the purposes of this section—

.    .    .    .    .

"(4) The term 'excessive profits' means any amount of a contract or subcontract price which is found as a result of renegotiation to represent excessive profits.

"(5) The term 'subcontract' means any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of another contract or subcontract. The term 'article' includes any mate-

rial, part, assembly, machinery, equipment, or other personal property.

"For the purposes of subsections (d) and (e) of this section, the term 'contract' includes a subcontract and the term 'contractor' includes a subcontractor.

.　　　.　　　.　　　.　　　.

"(c) (1) Whenever, in the opinion of the Secretary of a Department, the profits realized or likely to be realized from any contract with such Department, or from any subcontract thereunder whether or not made by the contractor, may be excessive, the Secretary is authorized and directed to require the contractor or subcontractor to renegotiate the contract price. When the contractor or subcontractor holds two or more contracts or subcontracts the Secretary in his discretion, may renegotiate to eliminate excessive profits on some or all of such contracts and subcontracts as a group without separately renegotiating the contract price of each contract or subcontract.

"(2) Upon renegotiation, the Secretary is authorized and directed to eliminate any excessive profits under such contract or subcontract (i) by reductions in the contract price of the contract or subcontract, or by other revision in its terms; or (ii) by withholding, from amounts otherwise due to the contractor or subcontractor, any amount of such excessive profits; or (iii) by directing a contractor to withhold for the account of the United States, from amounts otherwise due to the subcontractor, any amount of such excessive profits under the subcontract; or (iv) by recovery from the contractor or subcontractor, through repayment, credit or suit, of any amount of such excessive profits actually paid to him; or (v) by any combination of these methods, as the Secretary deems desirable. The Secretary may bring actions on behalf of the United States in the appropriate courts of the United States to recover from such contractor or subcontractor, any amount of such excessive profits actually paid to him and not withheld or eliminated by some other method under this subsection. The surety under a contract or subcontract shall not be liable for the repayment of any excessive profits thereon. All money recovered by way of repayment or suit under this subsection shall be covered into the Treasury as miscellaneous receipts.

"(3) In determining the excessiveness of profits realized or likely to be realized from any contract or subcontract, the Sec-

retary shall recognize the properly applicable exclusions and deductions of the character which the contractor or subcontractor is allowed under Chapter 1 and Chapter 2E of the Internal Revenue Code. In determining the amount of any excessive profits to be eliminated hereunder the Secretary shall allow the contractor or subcontractor credit for Federal income and excess profits taxes as provided in section 3806 of the Internal Revenue Code.

"(4) Upon renegotiation pursuant to this section, the Secretary may make such final or other agreements with a contractor or subcontractor for the elimination of excessive profits and for the discharge of any liability for excessive profits under this section, as the Secretary deems desirable. Such agreements may cover such past and future period or periods, may apply to such contract or contracts of the contractor or subcontractor, and may contain such terms and conditions, as the Secretary deems advisable. . . .

"(5) Any contractor or subcontractor who holds contracts or subcontracts, to which the provisions of this section are applicable, may file with the Secretaries of all the Departments concerned statements of actual costs of production and such other financial statements for any prior fiscal year or years of such contractor or subcontractor, in such form and detail, as the Secretaries shall prescribe by joint regulation. Within one year after the filing of such statements, or within such shorter period as may be prescribed by such joint regulation, the Secretary of a Department may give the contractor or subcontractor written notice, in form and manner to be prescribed in such joint regulation, that the Secretary is of the opinion that the profits realized from some or all of such contracts or subcontracts may be excessive, and fixing a date and place for an initial conference to be held within sixty days thereafter. If such notice is not given and renegotiation commenced by the Secretary within such sixty days the contractor or subcontractor shall not thereafter be required to renegotiate to eliminate excessive profits realized from any such contract or subcontract during such fiscal year or years and any liabilities of the contractor or subcontractor for excessive profits realized during such period shall be thereby discharged.

"(6) This subsection (c) shall be applicable to all contracts and subcontracts hereafter made and to all contracts and sub-

contracts heretofore made, whether or not such contracts or subcontracts contain a renegotiation or recapture clause, unless (i) final payment pursuant to such contract or subcontract was made prior to April 28, 1942, . . . ."

.    .    .    .

"(c) [SEC. 801.] Section 403 of the Sixth Supplemental National Defense Appropriation Act (Public 528, 77th Cong., 2d Sess.), is amended by adding at the end thereof the following subsections:

"(i) . . .

.    .    .    .

"(2) The Secretary of a Department is authorized, in his discretion, to exempt from some or all of the provisions of this section—

"(i) any contract or subcontract to be performed outside of the territorial limits of the continental United States or in Alaska;

"(ii) any contracts or subcontracts under which, in the opinion of the Secretary, the profits can be determined with reasonable certainty when the contract price is established, such as certain classes of agreements for personal services, for the purchase of real property, perishable goods, or commodities the minimum price for the sale of which has been fixed by a public regulatory body, of leases and license agreements, and of agreements where the period of performance under such contract or subcontract will not be in excess of thirty days; and

"(iii) a portion of any contract or subcontract or performance thereunder during a specified period or periods, if in the opinion of the Secretary, the provisions of the contract are otherwise adequate to prevent excessive profits.

"The Secretary may so exempt contracts and subcontracts both individually and by general classes or types."

.    .    .    .

56 Stat. 982.

### III.

Excerpts from the so-called Second Renegotiation Act, Title VII, Renegotiation of War Contracts, passed notwithstanding the objec-

tions of the President, February 25, 1944, c. 63, 58 Stat. 21, 78–92, 50 U. S. C. (Supp. V, 1946) § 1191; also 26 U. S. C. A. *Internal Revenue Acts Beginning 1940*, Revenue Act of 1943, § 701, p. 491.

While § 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as expanded by § 701 (b) of the Revenue Act, 1943, is too long for reproduction here, the following excerpts from it are especially relevant: § 403 (a) (4) (A); § 403 (c) (1); § 403 (d) (1); § 403 (d) (4); § 403 (e) (1); § 403 (e) (2); § 403 (l); see also, § 701 (d) of the Revenue Act of 1943:

"SEC. 701. RENEGOTIATION OF WAR CONTRACTS.

.          .          .          .          .

"(b) RENEGOTIATION OF WAR CONTRACTS.—Section 403, as amended, of the Sixth Supplemental National Defense Appropriation Act, 1942, is amended to read as follows:

"SEC. 403. (a) For the purposes of this section—

.          .          .          .          .

"(4) (A) The term 'excessive profits' means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this section to be excessive. In determining excessive profits there shall be taken into consideration the following factors:

"(i) efficiency of contractor, with particular regard to attainment of quantity and quality production, reduction of costs and economy in the use of materials, facilities, and manpower;

"(ii) reasonableness of costs and profits, with particular regard to volume of production, normal pre-war earnings, and comparison of war and peacetime products;

"(iii) amount and source of public and private capital employed and net worth;

"(iv) extent of risk assumed, including the risk incident to reasonable pricing policies;

"(v) nature and extent of contribution to the war effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

"(vi) character of business, including complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

"(vii) such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors

shall be published in the regulations of the Board from time to time as adopted.

"(c) (1) Whenever, in the opinion of the Board, the amounts received or accrued under contracts with the Departments and subcontracts may reflect excessive profits, the Board shall give to the contractor or subcontractor, as the case may be, reasonable notice of the time and place of a conference to be held with respect thereto. The mailing of such notice by registered mail to the contractor or subcontractor shall constitute the commencement of the renegotiation proceeding. At the conference, which may be adjourned from time to time, the Board shall endeavor to make a final or other agreement with the contractor or subcontractor with respect to the elimination of excessive profits received or accrued, and with respect to such other matters relating thereto as the Board deems advisable. Any such agreement, if made, may, with the consent of the contractor or subcontractor, also include provisions with respect to the elimination of excessive profits likely to be received or accrued. If the Board does not make an agreement with respect to the elimination of excessive profits received or accrued, it shall issue and enter an order determining the amount, if any, of such excessive profits, and forthwith give notice thereof by registered mail to the contractor or subcontractor. In the absence of the filing of a petition with The Tax Court of the United States under the provisions of and within the time limit prescribed in subsection (e) (1), such order shall be final and conclusive and shall not be subject to review or redetermination by any court or other agency. The Board shall exercise its powers with respect to the aggregate of the amounts received or accrued during the fiscal year (or such other period as may be fixed by mutual agreement) by a contractor or subcontractor under contracts with the Departments and subcontracts, and not separately with respect to amounts received or accrued under separate contracts with the Departments or subcontracts, except that the Board may exercise such powers separately with respect to amounts received or accrued by the contractor or subcontractor under any one or more separate contracts with the Departments or subcontracts at the request of the contractor or subcontractor. Whenever the Board makes a determination with respect to the amount of excessive profits, whether such determination is made by order or is embodied in an agreement with the contractor or subcontractor, it shall, at the request of the contractor or subcontractor, as the case may be, prepare and furnish such contractor or subcontractor with a statement of such deter-

mination, of the facts used as a basis therefor, and of its reasons for such determination. Such statement shall not be used in The Tax Court of the United States as proof of the facts or conclusions stated therein.

"(d) (1) There is hereby created a War Contracts Price Adjustment Board (in this section called the 'Board'), which shall consist of six members. . . .

"(4) The Board may delegate in whole or in part any power, function, or duty to the Secretary of a Department, and any power, function, or duty so delegated may be delegated in whole or in part by the Secretary to such officers or agencies of the United States as he may designate, and he may authorize successive redelegations of such powers, functions, and duties.

"(e) (1) Any contractor or subcontractor aggrieved by an order of the Board determining the amount of excessive profits received or accrued by such contractor or subcontractor may, within ninety days (not counting Sunday or a legal holiday in the District of Columbia as the last day) after the mailing of the notice of such order under subsection (c) (1), file a petition with The Tax Court of the United States for a redetermination thereof. Upon such filing such court shall have exclusive jurisdiction, by order, to finally determine the amount, if any, of such excessive profits received or accrued by the contractor or subcontractor, and such determination shall not be reviewed or redetermined by any court or agency. The court may determine as the amount of excessive profits an amount either less than, equal to, or greater than that determined by the Board. A proceeding before the Tax Court to finally determine the amount, if any, of excessive profits shall not be treated as a proceeding to review the determination of the Board, but shall be treated as a proceeding de novo. . . .

"(2) Any contractor or subcontractor . . . aggrieved by a determination of the Secretary made prior to the date of the enactment of the Revenue Act of 1943, with respect to a fiscal year ending before July 1, 1943, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days (not counting Sunday or a legal holiday in the District of Columbia as the last day) after the date of the enactment of the Revenue Act of 1943, file a petition with The Tax Court

of the United States for a redetermination thereof, and any such contractor or subcontractor aggrieved by a determination of the Secretary made on or after the date of the enactment of the Revenue Act of 1943, with respect to any such fiscal year, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days (not counting Sunday or a legal holiday in the District of Columbia as the last day) after the date of such determination, file a petition with The Tax Court of the United States for a redetermination thereof. Upon such filing such court shall have the same jurisdiction, powers, and duties, and the proceeding shall be subject to the same provisions, as in the case of a petition filed with the court under paragraph (1), except that the amendments made to this section by the Revenue Act of 1943 which are not made applicable as of April 28, 1942, or to fiscal years ending before July 1, 1943, shall not apply.

.          .          .          .          .

"(l) This section may be cited as the 'Renegotiation Act'."

.          .          .          .          .

"(d) [SEC. 701.] EFFECTIVE DATE.—The amendments made by subsection (b) shall be effective only with respect to the fiscal years ending after June 30, 1943, except that (1) the amendments inserting subsections (a) (4) (C), (a) (4) (D), (i) (1) (C), (i) (1) (D), (i) (1) (F), (i) (3), and (l) in section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, shall be effective as if such amendments and subsections had been a part of section 403 of such Act on the date of its enactment, and (2) the amendments adding subsection (d) and (e) (2) to section 403 of such Act shall be effective from the date of the enactment of this Act." 58 Stat. 78.

MR. JUSTICE DOUGLAS dissenting in part.

The business involved in the *Lichter* case relates to profits realized during the fiscal year ending December 31, 1942. As to the amounts owed under these contracts, petitioners are entitled to a hearing in the District Court. For Congress did not require that class of contracts to be taken to the Tax Court. I think a close reading of the statutes, contained in Appendix III to the Court's opinion, will bear me out.

Section 403 (e) (1) relates to orders of the Board and provides that they may be reviewed by the Tax Court. And § 403 (c) (1) provides that in the absence of the filing of such a petition with the Tax Court, the orders of the Board "shall be final and conclusive."

But we are concerned here not with orders of the Board but with an order of the Secretary. Section 403 (e) (2) provides that those orders, too, may be taken to the Tax Court. But § 403 (e) (2) by its terms makes inapplicable those provisions of the 1943 amendment which are not made applicable as of April 28, 1942, or to the fiscal years ending before July 1, 1943. Thus, § 403 (c) (6) limits subsection (c) "to all contracts and subcontracts, to the extent of amounts received or accrued thereunder in any fiscal year ending after June 30, 1943, whether such contracts or subcontracts were made on, prior to, or after the date of the enactment of the Revenue Act of 1943." Hence it is clear that the provision of § 403 (c) (1) which makes the orders of the Board final and conclusive in absence of the filing of a petition with the Tax Court is not applicable here. Orders of the Secretary, at least as respects 1942 business, are therefore treated differently than orders of the Board. I conclude that the purpose was to leave contracts and contractors who fell in that category with the right of access to the courts which they had enjoyed prior to the Revenue Act of 1943. In those cases jurisdiction of the Tax Court may be invoked at the option of the petitioners.

*Macauley* v. *Waterman S. S. Corp.*, 327 U. S. 540, is not opposed to this conclusion. For that case involved an order of the Board. *Wade* v. *Stimson*, 331 U. S. 793, involved an order of the Secretary and related to 1942 business. But the question in issue here was not raised there, as it is not in *Alexander Wool Combing Co.* v. *United States*, decided this day.