Zimmerman, J.
This cause is here on an appeal by the Eastern Machinery Company from a decision of the Board of Tax Appeals and is before this court for a second time pursuant to the allowance of appellant’s application for rehearing. For former report of this case, see Eastern Machinery Co. v. Peck, Tax Commr., 160 Ohio St., 144, 114 N. E. (2d), 55.
The single question now presented is whether the decision of the board was unreasonable or unlawful in the determination of the amount and value of appellant’s intangible personal property subject to taxation for the years 1948 and 1949.
It is the contention of the appellant as set forth in subdivision (b) of its assignment of errors that the Board of Tax Appeals erroneously determined “that amounts which had been payable (prior to tax listing-day) to Eastern for goods and services by departments of the United States Government but which had been seized by another department (War Department), *3 pursuant to statutory authority, and applied to the satisfaction of its claim against Eastern for the repayment of excessive profits on contracts subject to renegotiation, were nonetheless taxable as intangible personal property of Eastern.”
With respect to the issue in controversy, the “agreed statement of facts ’ ’ entered into by and between counsel before the Board of Tax Appeals shows the following :
“10. (a) Under authority of Section 402 of the Sixth Supplemental National Defense Appropriation Act of 1942 as amended, on June 21, 1944, the Under Secretary of War unilaterally determined that during its fiscal year ending September 30, 1942, Eastern had realized excess profits in the amount of $143,000 on contracts subject to renegotiation and ordered Eastern to repay said amount to the Treasurer of the United States, less any tax credit to which Eastern might be entitled after recomputation of its federal income tax for said year so as to give effect to the elimination of said excess profits from income. Recomputation of the tax produced a credit of $86,746.35, leaving a net renegotiation refund for said year of $56,253.65, which beeame due and payable by Eastern 15 days after the date of said determination (June 21,1944). A like determination was made on October 18, 1945, with respect of Eastern’s fiscal year ending September 30, 1943, in the amount of $135,000, which Eastern was ordered to pay in like manner less any tax credit. Recomputation of Eastern’s income tax for said year resulted in a reduction in the tax of $54,000 leaving a net renegotiation refund of $81,000, which became due and payable by Eastern 15 days after the date of the determination (October 18, 1945). The law made no provision for postponement of payment of said refunds pending appeal to the Tax Court.
“(b) Eastern did not repay said renegotiation re *4 funds and between October 10, 1946, and September’ 30, 1947, the War Department of the United States seized accounts payable to Eastern, for goods and services, by other departments of the federal government and applied said accounts to the satisfaction of said refunds and the statutory interest (6%) accrued and accruing thereon amounting to $19,557.87. On September 30, 1947, the amount due United States by Eastern on account of said refunds (after the application of said accounts) was $113,181.83.
“(c) On September 30, 1947, Eastern carried on its books, said accounts receivable from departments of the United States Government in the amount of $48,277.97; including the accounts in the amount of $43,629.69 which had already been seized and applied to the satisfaction of said renegotiation. On the same date Eastern also carried on its books a claim for refund to it of income taxes erroneously paid to the United States Treasury in the amount of $43,023.68.
“(d) Eastern did not list in its personal property tax return for its fiscal year ended September 30, 1947 (1948 return), the aforesaid accounts receivable in the amount of $48,277.97 nor the aforesaid claims for refund of income taxes in the amount of $43,023.68, nor did Eastern list in said return, as an account payable the balance due the United States Government on September 30, 1947, of $113,181.83 on account of said renegotiation refunds. The Tax Commissioner ordered said accounts receivable ($48,277.97) and tax claim ($43,629.69) listed and assessed for taxation but did not allow Eastern to deduct the balance of said renegotiation refunds from the sum of its accounts receivable and prepaid items.
“(e) On May 18, 1948, Eastern paid $23,754.29 on said renegotiation refunds and on September 30, 1948, the amount due and payable by Eastern on account of said renegotiation refunds was $95,142.82. On the *5 same date Eastern carried on its books a claim for refund of income taxes erroneously paid from the United States Treasury in the amount of $33,634.59.
“(f) Eastern did not list in its personal property tax return for its fiscal year ending September, 1948 (1949), the aforesaid tax claim in the amount of $33,634.59 nor the balance due the United States Government on September 30, 1948, of $95,142.82 on account of said renegotiation refunds. The Tax Commissioner ordered said tax claim listed and assessed for taxation but did not allow Eastern to deduct the balance due on said renegotiation refunds from the sum of its accounts receivable and prepaid items.”
It is apparent from an examination of appellant’s tax returns for the years 1948 and 1949 that in the year 1947 it set up a reserve on its books in the amount of $125,000, denoted “reserve for renegotiation in suit in Tax Court, items 54 and 55, in assets seized by U. S. in this suit.” In the year 1948, the amount of this reserve was increased to $148,688.40.
In the absence of anything appearing to the contrary, it must be assumed that on tax listing day in 1947 and 1948 there had been no final determination against or for the appellant in the United States Tax Court.
As we view the matter, there are two decisive questions in the case:
1. Under the terms of Section 5327, General Code, should the accounts receivable which had been “seized” by the United States Government be included as accounts receivable in computing appellant’s taxable credits?
2. Should the amounts of the “renegotiated refunds” unilaterally determined to be due the United States from appellant be classed as accounts payable in computing taxable credits of the appellant, under the provisions of Section 5327, General Code?
*6 Both the Tax Commissioner and the Board of Tax Appeals determined that these seized accounts due the appellant were taxable, and that the amounts claimed by the United States as renegotiation refunds were not accounts payable and were not entitled to be treated as such.
Under the provisions of Section 5638, General Code, a tax of three mills on the dollar is levied on certain intangible items, including “credits.” Section 5327, General Code, defines “credits” as follows:
“The term ‘credits’ as so used, means the excess of the sum of all current accounts receivable and prepaid items used in business when added together estimating every such account and item at its true value in money, over and above the sum of current accounts payable of the business, other than taxes and assessments. ‘Current accounts’ includes items receivable or payable on demand or within one year from the date of inception, however evidenced.”
The question which first arises is whether the accounts seized by the United States and applied against the appellant’s indebtedness under the Renegotiation Act (Title 50, Section 1191, as amended, U. S. Code) constituted accounts receivable under Section 5327, General Code, or other taxable intangibles under Section 5327-1, General Code. Undoubtedly, prior to the seizure such accounts were accounts receivable, but the controlling consideration here was the effect of such seizure on the right and title of the appellant in these accounts. To determine this we must ascertain by what right and under what authority the United States set off these accounts against the appellant’s indebtedness as determined under the Renegotiation Act.
It is apparently conceded that appellant’s contracts with the United States contained a renegotiation clause and were subject to renegotiation. It is an elementary principle that any law relating to a contract which is *7 in existence at the time of the execution of the contract becomes a part of such contract. 9 Ohio Jurisprudence, 416, Section 189; Palmer & Crawford v. Tingle, 55 Ohio St., 423, 45 N. E., 313; Jacot v. Secrest et al., Bd. of Edn., 153 Ohio St., 553, 93 N. E. (2d), 1.
In the present case the federal act involved was amended from time to time with a provision that a retroactive effect be given certain of the amendments. Such retroactive feature was approved in Lichter v. United States, 334 U. S., 742, 92 L. Ed., 1694, 68 S. Ct., 1294, and in Eastern Machinery Co. v. Under Secretary of War (C. C. A., D. C.), 182 F. (2d), 99. Thus the Renegotiation Act and any of its applicable amendments became a part of the contracts under examination.
To determine, therefore, the rights of the United States in seizing appellant’s accounts and the effect of such seizure thereon, such contracts must be read in conjunction with the provisions of the Renegotiation Act.
Obviously, the purpose of the Renegotiation Act was to eliminate excess profits from war contracts. The act was intricate and complex but, as it affects the instant case, a brief statement of its operation will suffice. The act provided for a periodic examination of the profits earned under war contracts and in the event excess profits were determined to exist a refund or recovery of such excess profits by the United States was authorized. One of the methods provided by the act for the recovery of such excess profits was the sequestration or seizure by the United States of other monies due the contractor from the federal government. The act alsp made provision for an appeal to the Tax Court of the United States from the original determination of excess profits and further provided that such an appeal did not operate to suspend or stay the original order.
*8 With these facts in mind the precise problem before us emerges with greater clarity. Here we have contracts which, construed in conjunction with the law made a part thereof, bound appellant to a renegotiation which carried with it a determination of profits. If such profits were found to be excessive appellant agreed to return such excess and'upon a failure to do so the United States was empowered to set off against the excess profits or renegotiation indebtedness other amounts owing to the appellant on additional contracts it had with the United States.
The situation is unlike the ordinary debtor-creditor relationship where a setoff may be asserted, for here the appellant by its contracts agreed that the United States might apply other monies owing it in other transactions to the amount claimed to be due the government.
Under such agreement and the controlling law, the United States appropriated the other accounts referred to and applied the proceeds to the appellant’s indebtedness by virtue of the Renegotiation Act. In the exercise of this right under the contracts and the statutes, the United States had divested the appellant of its ownership in the seized accounts. The authority of the United States to seize such accounts was not open to question since such rights arose not only by the law itself but by the incorporation of that law into the contracts. In fact, the only thing subject to challenge by an appeal to the Tax Court was the amount of the renegotiation indebtedness. During the period covered by the tax returns in issue appellant, as pointed out, had been divested of its title to such accounts.
This case is similar to the payment of taxes under protest. After payment, the taxpayer has no title to the funds paid notwithstanding he may later recover them as a refund. In the situation before us, the appellant agreed with the United States that if excessive *9 profits were found to exist the federal government might apply other amounts owed appellant by the government to the satisfaction or part satisfaction of such excess.
It is true that at some time in the future appellant’s indebtedness under the Renegotiation Act might be reduced or erased by appeal to the Tax Court and thereby it might recover all or a portion of the seized accounts, but for the periods covered by these tax returns it would be a hypertechnical construction of the Ohio tax laws to hold that the appellant had an interest in these seized accounts, amenable to taxation.
The remaining question presented is whether the renegotiation refunds imposed under the federal act and charged against the appellant were accounts payable and as such deductible as credits under the provisions of Section 5327, General Code.
Much of what has been said concerning the seized accounts is applicable to this question and need not be repeated. It is only necessary to reiterate that the federal law was a part of appellant’s contracts with the federal government and that by the terms of such contracts appellant agreed that its contracts with the United States were subject to renegotiation for the purpose of eliminating excess profits. As already noted, a renegotiation proceeding had taken place and an order had been issued finding excess profits returnable to the United States. Although it is true that such determination was subject to an appeal to the United States Tax Court for a trial de novo as to the correctness of the amount fixed in the renegotiation order, the act specifically provided that such appeal did not operate as a stay or an eradication of the order appealed from. Even though a contractor has an appeal pending in the Tax Court for a redetermination of its liability under the Renegotiation Act, the United States may still proceed by an action in the *10 United States District Court to collect the refund found owing under the Renegotiation Act.
Upon an analysis of the controlling portions of the Renegotiation Act, it would seem plain that where an amount has been found due the federal government by way of excess profits and an order made to that effect, such order is not stayed by an appeal to the' Tax Court. If ultimately that court decides in favor of the appealing contractor, in whole or in part, the contractor will then be allowed the proper refund. See United States v. Raymond De-Icer Corp. (D. C., N. Y.), 96 F. Supp., 14.
Therefore, appellant’s indebtedness to the federal government on tax listing day or when it filed its tax returns was not a mere contingent liability as claimed by the Tax Commissioner.
Bearing in mind that the debt here involved was one which arose by the terms of contracts, that it became a debt due and payable after a determination in a renegotiation proceeding, and that the United States could move to collect such refund even though an appeal from the order creating the debt was pending in the Tax Court, it seems to us that during the tax periods in issue here such a renegotiation refund constituted an account payable under the provisions of Section 5327, General Code, and so was deductible by the taxpayer as a credit.
The case of Black-Clawson Co. v. Evatt, Tax Commr., 139 Ohio St., 100, 38 N. E. (2d), 403, has been cited and commented upon by counsel. That case is distinguisable from the instant one in that there the liability claimed had not yet arisen and would arise only in the event of a breach of contract, whereas in the case at bar a liability had been established even though such liability might be reduced or extinguished on an appeal.
The appellant’s method of treating these items in *11 its bookkeeping system is not determinative as to the status of such items for tax purposes. As was said in the Black-Clawson case, “after all the test is not what is good accounting practice but what is the meaning and intent of the taxational provision.”
As we are of the opinion that the decision of the Board, of Tax Appeals is unreasonable and unlawful, the same is reversed and the cause remanded to the' board for the action this opinion requires.

Decision reversed.,

Middleton, Taft, Hart, Stewart and Lamneck, JJ., concur.