In the Matter of PACIFIC AUTOMATION
PRODUCTS, INC., a California cor-
poration, Debtor.

No. 153330.

United States District Court
S. D. California,
Central Division.

Jan. 6, 1964.

Francis C. Whelan, U. S. Atty., Donald A. Fareed, Asst. U. S. Atty., Gordon P. Levy, Asst. U. S. Atty., for the United States, petitioner on review.

Flaxman & Coleman, Los Angeles, Cal., for William V. Martin, receiver, respondent on review.

BYRNE, District Judge.

Pacific Automation Products, Inc., Debtor, filed a petition under section 322 of the National Bankruptcy Act (11 U. S.C. § 722) for leave to file a Plan of Arrangement with its creditors. This petition was filed on March 27, 1963. On the same day William V. Martin was appointed Receiver with authority to operate the Debtor's business, and pursuant to this authority the Receiver took possession of the business and all of its assets and commenced to manage its affairs.

Prior to the initiation of these proceedings the Debtor had rendered services to the Radio Corporation of America, R.C.A., under a certain purchase order, which was issued under a General Dynamics/Astronautics purchase order to R.C.A., which purchase order was in turn issued under a United States Air Force, USAF, contract with General Dynamics/Astronautics. Thus Debtor was a subcontractor under a USAF contract. Prior to March 27, 1963, Debtor had completed all of its services to R.C.A. but due to certain technicalities invoices totalling $21,667.94 were not sent to R.C.A. until April 1 and April 4.

At an earlier time, that is on November 15, 1962, the Debtor had entered into a Renegotiation Agreement with the United States of America. The agreement was entered into pursuant to the terms of 50 U.S.C.App. § 1211 et seq. The purpose of the agreement was to allow the Government to recapture excessive profits made by the Debtor on government contracts during its fiscal year ending in August of 1958. This agreement was modified on February 8, 1963. Under the terms of the modification the Debtor was to make a first payment of $25,000 on or before April 17, 1963. This had been moved from January 17, 1963, which was the date that the first payment was due under the original agreement.

The April 17 payment was not made and on May 17, 1963, the Secretary of the Air Force issued an order requiring all sub-contractors on government contracts to withhold monies owed to the Debtor and to hold them for the account of the Government. This action was purportedly authorized by the terms of the Renegotiation Act, and particularly by 50 U.S.C.App. § 1215(b) (1) (C). R.C.A. then advised the Debtor and the Receiver that because of the order of the Secretary of the Air Force it could not pay the $21,667.94 which it owed.

An order to show cause issued, hearing was had on October 22, 1963, and on November 1, 1963, the Referee made an order declaring that the amount in controversy was an asset of the Debtor's estate and should be paid over to the Receiver.

On November 7, 1963, the Government filed a petition for review alleging numerous errors in the Referee's Findings of Fact and Conclusions of Law. In effect, and putting it generally, the issue raised by these objections taken as a whole is, whether or not the authority vested in the Government by reason of the Renegotiation Act is such that it overcomes the provisions of the Bankruptcy Act, and thus allows the Government to obtain assets of the Debtor's estate which would otherwise come under the control of the Bankruptcy Court.

In his Certificate on Petition for Review, filed on November 21, 1963, the Referee states the three basic issues raised by counsel in their arguments before him as follows:

1. Is the Bankruptcy Act, which is passed pursuant to powers directly granted under the Constitution, supreme and paramount to Title 50 (Renegotiation Act Title 50, Sections 1214 and 1215, U.S.C.A.)?

2. Assuming that both Acts stand on a parity, which Act in effect speaks of a later date?

3. [Was the notice given by the Secretary of the Air Force under 50 U.S.C. § 1215(b) (1) (C) ineffective to create rights in him, since the property in question was then in the possession or custody of the Bankruptcy Court?]

In addition to this, although it appears that no such argument was made to the Referee and that no direct testimony on the point was offered, the Government now argues that the Debtor entered into the modification of the Renegotiation agreement in bad faith. It is said that this fact resulted in precluding the Government from exercising its rights under the Renegotiation Act, including the right to have other sub-contractors pay monies owed to the Debtor directly to the Government. It is inferred that the sole purpose of this was to put off the Government long enough to get into the Bankruptcy Court, and that because of this the Debtor should not be allowed the benefits of arrangement proceedings, at least as to the claims of the Government. The Government does not cite any authorities whatever, either statutory, judicial or otherwise, for this proposition, and I have found none.

It is true that pursuant to 11 U.S.C. § 766(3) an arrangement cannot be confirmed if the Debtor has been guilty of any acts, "which would be a bar to the discharge of a bankrupt," and that under 11 U.S.C. § 32 discharge in bankruptcy can be denied if the Debtor has obtained an extension of credit by reason of making a materially false written financial statement. But there is no showing or allegation that any such statement was ever submitted to the Government, and quite the contrary appears to be true. This, points up one of the difficulties of trying to raise a question for the first time on review, especially without citation of authority. The Court is forced to guess at what the legal basis of the Government's contention is supposed to be. There are no sufficient facts before the Court which would justify a finding of bad faith, and such a charge should not be sustained on the basis of mere speculation.

*Is the Bankruptcy Act, which is passed pursuant to powers directly granted under the Constitution supreme and paramount to the Renegotiation Act?* The Referee's Conclusions of Law IX and XI state:

IX. That the Court concludes that the National Bankruptcy Act was passed pursuant to Article 1, Section 8, Clause 4 of the Constitution of the United States and is the supreme law of the land, and any enactment, whether state or federal, unless it expressly provides therefor, cannot interfere with the National Bankruptcy Act. That the Renegotiation Act can have no effect upon the National Bankruptcy Act (Title 11, U.S.C.).

XI. That the Renegotiation Act in purporting to create a greater right in a governmental agency than it enjoys under the National Bankruptcy Act, is in conflict with and competing therewith, and must give way to the Bankruptcy Act.

It is, of course, true that the Bankruptcy Act was enacted pursuant to Article I, Section 8, Clause 4, of the United States Constitution, and, as such, it is the supreme law of the land by virtue of the Supremacy Clause (Article VI, clause 2). But from there the reasoning goes downhill. The fact that the Bankruptcy Act is grounded on the Constitution does not make it unique. Indeed, since the Federal Government is a government of delegated authority and limited powers,

every act of Congress must either be grounded in the Constitution or be of no effect whatever. Thus, in upholding the constitutionality of an earlier Renegotiation Act, upon which the present act is based, the Supreme Court pointed out that it was firmly and clearly grounded upon Article I, Section 8, Clause 11 of the Constitution, which vests the war power in Congress. Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L. Ed. 1694 (1947), rehearing denied, Pownall v. U. S., 335 U.S. 836, 69 S.Ct. 11, 93 L.Ed. 389 (1948). Therefore, both the Bankruptcy Act and the Renegotiation Act are firmly grounded upon the Constitution and both are, of course, the supreme law of the land. Given that undeniable fact there is certainly no basis for saying that one Act is more supreme than the other. Such a notion would add great confusion to constitutional law. E.G., if the Bankruptcy Clause begets more supreme statutes than the War Clause, does it also beget more supreme statutes than the Patents and Copyrights Clause? If so, are statutes under the Patents and Copyrights Clause more supreme than those passed under the War Clause? etc.

Thus, if the Renegotiation Act really does "purport" to give a governmental agency rights which override the Bankruptcy Act, then the Bankruptcy Act is overridden. If that were the intent of Congress, it is not for any court to say, "you can't do that by implication and must make an express provision to that effect, for the Bankruptcy Act is very supreme."

█ Since all acts of Congress are the supreme law of the land if they are constitutional, they all stand on the same footing. Thus, it cannot be said that the Bankruptcy Act is, by its very nature, supreme and paramount to the Renegotiation Act, and this case cannot be decided on that basis.

*Assuming that both Acts stand on a parity, which Act in effect speaks of a later date?* The Referee's answer to this question is set out in Conclusions of Law XII and XIII, which state:

XII. That the Renegotiation Act was passed in 1951 (Title 50, App., U.S.C., Sections 1214 and 1215, and that the last amendment to said section was in 1956, and the only provision amended therein was the interest provision. [Incidentally, although it is not important, this is not correct, since there was an amendment in 1962.]

XIII. That Section 64 of the National Bankruptcy Act, to wit: Title 11 U.S.C. § 104, was last amended in 1962, and it therefore speaks of a later date.

█ It is a principle of statutory construction that when two statutes passed by Congress show conflicting intents, the one which was enacted most recently will control. But it seems that the Receiver's argument and the Referee's Conclusions take this principle and reduce it to a mere mechanistic test of which statute was amended last. The fact is that one must attempt to find Congressional purpose and intent, but it cannot be assumed that when Congress passes a new piece of legislation it has in its mind and before its eyes every piece of legislation which was enacted in the past.

If Congress really intended to have the Renegotiation Act's provisions outside the reach of the Bankruptcy Act, the mere fact that the Bankruptcy Act's provisions relating to priorities have since been amended, without reference to the Renegotiation Act, is of no particular significance. Congress may not have thought about the problem at the time and there would be no reason to consider the Renegotiation Act repealed in this respect because the Bankruptcy Act has been amended. If the opposite were true, we would have the spectacle of the courts finding continual and ill-considered changes in Congressional intent on a day-to-day basis. Thus, in the case now before the Court, since both statutes were amended during 1962, the Court would have to discover which

amendment bears the latest date. In fact if the Bankruptcy Act's amendment was earlier it may be decided that during part of 1962 the Renegotiation Act was repealed, but that it sprung to life again when it was amended.

■ The mere fact that either the Renegotiation Act or the Bankruptcy Act was or was not most recently amended in its pertinent provisions is not a sufficient ground for deciding which one controls this case. It, therefore, does not appear useful to decide which act was most lately amended, for the important thing involved is Congressional intent, and that is not shown by any such mechanistic pursuit.

*Do the terms of the Renegotiation Act give the Government a prior right to the funds which are owed by R.C.A. to the Debtor?* This issue really raises two sub-issues: A. Are agreements entered into under the Renegotiation Act outside the reach of the Bankruptcy Act?; and B. Was the Government given a lien on certain debts owed to the Debtor by reason of entering into the renegotiation agreement?

*Are agreements entered into under the Renegotiation Act outside the reach of the Bankruptcy Act?* Under the terms of section 64(5) of the Bankruptcy Act [11 U.S.C. § 104(5)] it is provided that debts owed to the United States are to occupy a fifth priority status. The question is whether debts incurred by reason of a renegotiation come within this provision, or if they are exempt therefrom. The solution of this question involves looking to the statutes themselves and ascertaining Congressional intent.

■ The purpose of the Renegotiation Act was to eliminate excessive profits made by government contractors, where they are related to the national defense. (50 U.S.C.App. § 1211) These profits often come about because new programs are launched and it is very difficult to know just how much it really costs to supply the equipment required thereunder. Thus, Congress has provided that an independent governmental agency will take a second look after the contractor has performed in order to see if the Government has been overcharged. If so, a number of steps can be taken to eliminate those profits and recapture the monies expended. (50 U.S.C.App. § 1215) At no point does the Act mention or even allude to Bankruptcy proceedings, and a reading of the very extensive and detailed debates in Congress shows that, in all probability, no Senator or Congressman thought about the Bankruptcy problem when this statute was enacted. Bankruptcy was never even mentioned in the debates or in the committee reports. That being the case it is probable that here, as is so often true, Congress was concentrating on a single specific problem and really had no specific intent regarding the bankruptcy problem when this Act was passed. However, what is clear is the fact that both houses of Congress were a little bit reluctant to pass such a statute at all. It was repeatedly said that this conflicted with the usual American theory of the sanctity of contracts. Nevertheless, this was a very special situation and an extraordinary remedy was required. But the whole atmosphere in which this Act was passed indicated that Congress wished to disturb normal economic and legal relationships as little as possible. The Act would supplement the excess profits taxes and would prevent contractors from taking unconscionable advantage of the Government, either by intent or inadvertence. Thus, this Act providing an extraordinary remedy for an unusual situation was passed. [See the legislative history in the Congressional Record, vol. 97, parts 1 and 2 (82d Congress, 1st session)]

■ On the other hand, the Bankruptcy Acts have been passed with an eye to establishing a general uniformity of procedure for the purpose of protecting and benefiting debtors and creditors alike. There is also great public interest involved, and it is said that the nation as a whole—and not just certain individuals—is benefited by the

terms of these Acts. It is a method of proceeding which is entirely consonant with our basic notions of justice and fairness.

■ Where Congress has passed an Act of general application, such as the Bankruptcy Act, a very specific act on an entirely different subject, which is passed at a later time, should not be taken as negating the general provisions of the first Act in the absence of some showing of an intent on the part of Congress to do so. In the Renegotiation Act Congress has simply provided a method by which the Government can recapture excessive profits. If an excessive profit is found the contractor merely owes the Government a debt, which can be collected in various ways. See United States v. Edward Valves Inc., 207 F.2d 329 (7th Cir. 1953), cert. denied, 347 U.S. 934, 74 S.Ct. 629, 98 L.Ed. 1085 (1954); and Sampson Motors v. United States, 168 F.2d 878 (9th Cir. 1948). There is no showing whatever that Congress intended to bypass the Bankruptcy Act and place this particular debt outside of its scope. Barring the showing of some such intent it should not be held that the Renegotiation Act has repealed the Bankruptcy Act for this purpose. The Bankruptcy Act applies in this case and the Government is a creditor of the Debtor.

■ *Was the Government given a lien on certain debts owed to the Debtor by reason of entering into the renegotiation agreement?* Under 50 U.S.C.App. § 1215(b) (1) (C) after a renegotiation agreement is entered into excessive profits may be eliminated by a direction from the Renegotiation Board to the Secretaries (including the Secretary of the Air Force) to do so by:

> directing any person having a contract with any agency of the Government, or any subcontractor thereunder, to withhold for the account of the United States from any amounts otherwise due from such person or such subcontractor to a contractor, or subcontractor, having

excessive profits to be eliminated, and every such person or subcontractor receiving such direction shall withhold and pay over to the United States the amounts so required to be withheld * * *.

The Government seems to contend that the mere entering into of the agreement causes a lien to be placed on all such owed monies, before any subcontractor or contractor is notified and possibly even before any directive issues from the Board to the Secretary. There is absolutely nothing in the terms of the Act itself to suggest that upon entering into an agreement an immediate lien attaches to all of the debts owed by other government contractors to the Debtor. It would certainly be unusual to find such a lien when those holding the monies had no notification whatever. Furthermore, if R.C.A. had paid the Debtor before the petition for an arrangement was filed, there is no ground for saying that a lien, or constructive trust, would then come into being as to the monies then in the hands of the Debtor. The Debtor does have a duty to pay the Government since the agreement determines that he owes a personal debt to the Government. See, United States v. Edward Valves Inc. and Sampson Motors v. United States, both supra. But there is no requirement that the Debtor get the money from any particular source. No such requirement can be found in the statute or in the particular contract entered into by the Government and the Debtor.

For this reason it seems that the Government did not have a lien upon the monies owed to the Debtor by R.C.A. at the time the Debtor filed its petition for an arrangement.

■ After that, the right to the payment was in the hands of the Receiver and was under the control of the Bankruptcy Court. [11 U.S.C. §§ 110, sub. a(5) and 110, sub. a(6)]. It was then too late for the Government to impose a lien upon it. To say that the lien could be imposed at any time after the start of proceedings would upset the

whole proceeding. In this case the Government first attempted to assert a lien on May 17, 1963, about two months after the proceedings had been started, but under its theory it could claim a lien and then impose one at any time, even after the proceeding was complete. If this position were sustained, it would just be another way of saying that the Renegotiation Act had repealed the Bankruptcy Act, which is not the case.

The Referee's order of November 1, 1963, which stated that the sum of $21,-667.93 must be paid by R.C.A. to the Receiver is *affirmed*. Of course this is not to say that the Government's claim is invalid. It will be treated pursuant to the provisions of the Bankruptcy Act.

Counsel for the Receiver is directed to prepare, serve and lodge a formal order pursuant to Rule 7 of the rules of this Court.